Ellwood T. HUGHES, Appellant,

v.

DISTRICT OF COLUMBIA, Appellee.

No. 79–246.

District of Columbia Court of Appeals.

Argued Nov. 13, 1980.

Decided Jan. 13, 1981.

L. Jackson Thomas II, Kent & Thomas, with whom Charles M. Holland, Joe O. Wiggs, and Gerald Bruce Lee, Alexandria, Va., were on the brief, for appellant.

Edward E. Schwab, Asst. Corp. Counsel, Washington, D. C., with whom Judith W. Rogers, Corp. Counsel, Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., at the time the brief was filed, and Martin L. Grossman, Asst. Corp. Counsel, Wash-

ington, D. C., were on the brief, for appellee.

Before MACK, FERREN and PRYOR, Associate Judges.

PRYOR, Associate Judge:

Appellant, Ellwood T. Hughes, brought a negligence action against the District of Columbia[1] to recover damages for personal injuries sustained when he was assaulted while an inmate of Lorton Reformatory. The case was tried before a jury. At the close of the evidence, a directed verdict was granted in favor of the District of Columbia. Appellant contends, on appeal, that the evidence adduced at trial was sufficient to warrant submission of the case to the jury, and that the trial court erred by directing a verdict. Viewing the evidence in the light most favorable to appellant, and giving appellant the benefit of all rational inferences raised by the evidence, *Gaither v. District of Columbia*, D.C.App., 333 A.2d 57 (1975), we conclude that appellant failed to establish negligence on appellee's part, and therefore, it was proper for the trial court to grant the District's motion for a directed verdict. We affirm.

I

In January 1972, appellant began serving a sentence at Lorton Reformatory for felony convictions. Upon entering Lorton, he was confined for two weeks in the Maximum Security Area, in "quarantine," for medical examination, classification, and testing. Thereafter, he was assigned to Dormitory # 1 in the Central Facility of the Reformatory.

Like the other medium security dormitories in the Central Facility, Dormitory # 1 is a long barracks-type building which houses approximately 40 inmates, all of whom sleep in a large sleeping room. Each dormitory also has a bathroom and smaller rooms for recreational activities. There is no electronic surveillance equipment. Prison guards enter the dormitories for brief periods between three and six times per day. After 10:00 p. m. when the lights are turned off for the night, inmates are free to move around within the dormitory.

In May 1973,[2] while in Dormitory # 1, several inmates awakened appellant during the night and forced him into the bathroom where they forced him to engage in unnatural sexual acts. The following day, appellant reported the incident to the Captain's Office. As a result of the report, appellant was placed in the Reformatory Hospital, where he stayed for two days, for observation.

Upon his release from the hospital, appellant was assigned to Dormitory # 20, another dormitory in the Central Facility. Approximately two months after appellant was transferred to Dormitory # 20, two inmates attempted to coerce him into sexual activity. When appellant refused, he was threatened. The following day, appellant's work supervisor overheard him recounting the incident to another inmate, and reported what he heard to the Captain's Office. As a result of the report, appellant was placed in protective custody in the Maximum Security Unit, where he remained for approximately two months.

While in the Maximum Security Unit, appellant was assigned to three different cell blocks (CBs), each having individual cells. For one week, appellant was assigned to CB-5. At his request, he was then transferred to CB-4 where the cells are unlocked each day in the morning, and remain unlocked until 10:00 p. m., with the exception of brief periods during which there are "body counts."

1. The Director of the D.C. Department of Corrections and the Superintendent of Lorton Reformatory were also named as defendants. The Director was dismissed from the case prior to trial, and during trial, appellant voluntarily dismissed the Superintendent of Lorton Reformatory.

2. The date of this incident, as with the others alleged, is not clear from the testimony. At trial, appellant gave conflicting testimony. His pretrial statement, incorporated into the pretrial order, indicates that the date was May 28, 1973. We have adopted that date and others contained in the pretrial order where the appellant gave conflicting dates at trial.

While appellant was housed in CB–4, two inmates entered his cell and coerced him into engaging in unnatural sexual relations with them. Although appellant did not immediately report the incident to officials, he did, however, request a transfer to CB–2. The request was granted.

In CB–2, inmates are locked in their cells most of the day. One night, while in his cell, two inmates, who worked as orderlies in the cell block, approached appellant and demanded that he perform fellatio. When appellant refused, they pelted him with apples and other objects.

On July 1, 1973, appellant submitted a request slip asking that he be returned to the Central Facility. He stated:

Sir: I would like to be returned to the central facility. I feel that I will adjust completely and that there will be no problems. I do not need protection and there will be no "gang war" as stated by the court as their reason for sending me to max. sec.

In a letter dated July 29, 1973, appellant reported the CB–2 incident and the earlier sexual assault in CB–4, to Delbert Jackson, Director of the Department of Corrections. He wrote:

I am now housed in the max. sec. facility, in spite of the fact that I have no misconduct report or suspicion of misconduct. It can not be logically stated that I am here for protection since max. sec. is the only place that I have had sharpened knives placed at my gut, and at my throat for the purpose of forcing me to submit to unnatural sex acts. Since I have been max. sec. all my property has been stolen ... The situation was so bad in CB–4 that I begged to be moved to CB–2 where I am locked in my cell most of the day and all day Sat. and Sun.

In spite of being locked in my cell in CB–2, I have been assaulted there in the following manner: One eve when the lights were out during a storm, I was approached by some of the orderlies, and when refusing them, I was assaulted, apples being thrown in my cell at me, but I had retreated to the corner and used my pillow and a blanket to protect myself.

How can anyone with intelligence say this is protection....

Mr. Jackson, I've known you since 1964 and I have never known you to permit an injustice to continue if it was in your power to correct it. I am now appealing to you to correct the injustice that is being imposed upon me, by my being put in max. sec. I can make it on the Hill [Central Facility] and given the chance I will make it on the Hill ....

Again I say, I do not need protection and I can make it on the Hill.

Please have me moved out of max. sec. as soon as possible.

Approximately one month after the written request to Mr. Jackson, appellant was assigned to Dormitory # 19 in the Central Facility. He remained there for two or three months, then requested to be transferred to Dormitory # 20 which is also in the Central Facility, but has smaller living quarters. The latter request was also granted.

While housed in the Central Facility, appellant was assigned to work in the Maintenance Supply Section. Initially he worked in an office behind his dormitory. He later was given a reassignment to the Maintenance Supply Yard, at his request. One day, in early July 1974, while working alone in the supply yard, two inmates from the Commissary Unit, which is located near the supply yard, climbed over the fence and into the supply yard. When appellant requested that the two men leave, they did so, after threatening him. Appellant reported the incident to his work supervisor; he requested, and was granted a transfer of his work assignment. He did not, however, report the matter to any other prison authorities, and did not request that his dormitory be changed.

The assault for which appellant seeks to hold the District liable occurred on July 26,

1974. The record does not reflect who perpetrated the assault or any circumstances surrounding it. Appellant has no recollection of how the assault occurred. Officer Jackson, a Lorton correctional officer, testified that on the date of the assault, at approximately 4:00 p. m., he noticed an inmate running in an area of the facility restricted to walking. When the inmate noticed the officer, he slowed down to a fast walk. The officer continued to observe the inmate. He watched him enter Dormitory # 13, and immediately exit, walking at a fast pace. The inmate began to run after he passed the officer. Suspecting that there was something unusual afoot, Officer Jackson walked to Dormitory # 13 and was told by an inmate that someone inside was hurt.

Officer Jackson went inside the dormitory and saw appellant lying in a pool of blood on the floor, bleeding profusely and struggling to get to his feet.[3] A piece of pipe lay near appellant on the floor. Nearby beds were in disarray as if there had been a struggle. Officer Jackson ordered the area sealed off and called for an ambulance.

Appellant was first taken to the reformatory hospital where emergency life support treatment was started. He was transferred from there to Dewitt Army Hospital for further intensive care treatment.

Dr. Ronald Uscinski, who was employed on July 26, 1974, by the District of Columbia General Hospital, as chief of neurosurgery, testified that on or about July 26, 1974, he treated appellant for head and facial injuries "which resulted in the tearing open of the membrane around his brain, and fracturing the bones of his face."

Appellant recalls waking up in the District of Columbia General Hospital with one false eye, holes in his head, incapable of smelling or tasting, and with pins in the bones of his face.

The record reflects that there were approximately 1,431 inmates at the Lorton Reformatory on July 26, 1974. Fifty-four guards and five supervisors were on duty during the 3:30 p. m. to midnight shift on that day. The "critical minimum" for that shift is 51 guards (including supervisors). These guards are responsible for, *inter alia*, overseeing the safety and well-being of the inmates and insuring that they adhere to prison rules and regulations.

## II

 D.C.Code 1973, § 24–442, provides in pertinent part:

> [The] Department of Corrections shall have charge of the management and regulations of . . . the Reformatory at Lorton . . . and be responsible for the safekeeping, care, protection, instruction, and discipline of all persons committed to such institutions.

This statutory provision encompasses the common law rule which imposed upon prison authorities and employees, a duty to exercise reasonable care in the protection and safekeeping of prisoners. *See Gaither v. District of Columbia, supra* at 60. Prison personnel are not, however, insurers of an inmate's safety, *Matthews v. District of Columbia*, D.C.App., 387 A.2d 731 (1978). Thus, the fact that an inmate is assaulted and sustains injuries, does not, by itself, establish liability. *See District of Columbia v. Davis*, D.C.App., 386 A.2d 1195, 1200 (1978). The plaintiff must establish by competent evidence a standard of care; that the defendant violated that standard; and that such violation proximately caused injury to the plaintiff. *Id.* If at the close of the case, the evidence viewed in the light most favorable to plaintiff, fails to establish the factors enumerated, a directed verdict against plaintiff is proper. *See id.* at 1200, 1201.

## III

Turning now to the evidence adduced at trial, it was shown that while incarcerated

---

**3.** The record does not reflect the reason appellant was in Dormitory # 13, or how he got there. He did not reside in that dormitory and was not permitted to be there.

at Lorton, between January 2, 1972, and July 1973, appellant was twice sexually assaulted, verbally abused, and struck with objects (fruit) in a threatening situation. When each incident was brought to the attention of prison authorities, corrective action was taken. Appellant was immediately removed from the perceived "danger area" and assigned to other living quarters. In the interest of safety, appellant was moved to the Maximum Security Unit where he remained for approximately two months. His release from the Maximum Security Unit came approximately one month after he made an earnest written request urging the Director of the Department of Corrections to allow him to return to the Central Facility.

For approximately one year from the time of his release from the Maximum Security Facility, appellant reported no threats or assaults. When in early July 1974, appellant was threatened on his job, he reported this incident to his work supervisor, but to no other prison authorities. He did not request a change of his dormitory assignment as he had done on previous occasions, but merely a change of his work assignment, which was granted. Appellant asserts that although he did not report the July 1974 threat to the proper prison officials, his report to his work supervisor put appellee on notice that he was in danger and, therefore, should have been removed from the general population and placed once again in protective custody (contrary to the express wishes, which had been honored, in his July 29, 1973 letter to Delbert Jackson).

■ Assuming arguendo, that appellant's proffer is correct that the report to the work supervisor placed appellee on notice that appellant was in danger, the record is devoid of the necessary evidence to support appellant's conclusion that the failure to return him to protective custody constituted negligence. As to this critical aspect of the case—the proper correctional procedures under the circumstances—appel-lant adduced scant evidence. In an effort to establish a standard of care, appellant simply relied on the prior conduct of the officials in this case and reference to Lorton's operating procedures. The trial court found this showing insufficient and we agree. It seems clear that a claimant cannot merely rely on what happened in his or her case to establish a lack of proper correctional care, but rather must show by competent expert testimony, or other supporting proof, that what occurred in the case at bar was a negligent deviation from the demonstrated acceptable standard, *Davis, supra.* With regard to this precise question, we have said that in instances where the subject presented is "so distinctly related to some science, profession, business, or occupation as to be beyond the ken of the average layman," *Davis, supra* at 1200, *citing Waggaman v. Forstmann,* D.C.App., 217 A.2d 310, 311 (1966), expert testimony is required to aid the jury in making a determination. Absent such testimony, the jury will be forced to engage in idle speculation which is prohibited. *Jones v. Safeway Stores, Inc.,* D.C.App., 314 A.2d 459, 460–61 (1974).

■ The question of whether prison officials acted reasonably to secure the safety of an inmate is not one within the realm of the everyday experiences of a lay person. The reasonably prudent juror cannot be expected to appreciate the ramifications of prison security as well as the parallel considerations involving the safekeeping of prisoners, and therefore, whether, under given circumstances, reasonable care was exercised. *See Matthews, supra* at 735. Thus, expert testimony or supporting evidence is necessary to establish that standard.

Such evidence was not introduced at trial. Nor was any evidence adduced to establish that failure to comply with the standard was the proximate cause of appellant's injury. *Davis, supra.*

Under the circumstances, a directed verdict was not error.

*Affirmed.*