Janie TOY, et al., Appellants,

v.

**DISTRICT OF COLUMBIA, Appellee.**

No. 87–289.

District of Columbia Court of Appeals.

Argued June 9, 1988.
Decided Oct. 14, 1988.

Samuel M. Shapiro and Cassandra P. Hicks, Rockville, Md., for appellants.

Martin B. White, Asst. Corp. Counsel, with whom Frederick D. Cooke, Jr., Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, and Lutz Alexander Prager, Asst. Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellee.

Before MACK, FERREN and ROGERS, Associate Judges.

ROGERS, Associate Judge:

In this wrongful death and survival action, appellants Janie Toy and Diane Toy, the mother[1] and widow of the decedent William Toy, seek to reinstate a jury verdict in their favor. They contend on appeal that the trial court erred in entering a judgment notwithstanding the verdict and in instructions to the jury on false arrest. We hold that because appellants failed to present expert testimony sufficient to establish the standard of care owed to the decedent by the District of Columbia, they failed to establish a prima facie case of negligence. Accordingly, because we also find no error in the false arrest instructions, we affirm.[2]

## I

William Toy died after being in a coma for thirteen months following his attempted suicide by hanging himself in a jail cell when he was arrested for driving while under the influence of alcohol. His mother and wife, appellants, sued the District of Columbia contending that it had acted negligently once Toy was found hanging in his cell. To prove their case, appellants relied on the expert testimony of Robert diGrazia

---

1. Janie Toy is also the administratrix of William Toy's estate.

2. In view of our holding that appellants failed to prove negligence, we do not reach other issues raised by the parties pertaining to causation, contributory negligence, assumption of risk, last clear chance, damages for loss of enjoyment of life, and excessiveness of the verdict.

to establish that the District had breached the applicable standard of care in responding to the situation. For purposes of this appeal, the central issue is whether diGrazia's testimony established that the District was negligent because it failed to have certain equipment on hand at the Traffic Division where Toy was taken and failed correctly to administer cardiopulmonary resuscitation (CPR) to him.

### A.

The evidence at trial showed that in the early morning hours of October 30, 1982, William Toy drove his car into a streetlight pole after failing to negotiate successfully a left turn at the corner of Third Street and Florida Avenue, N.W. Officer John Coursey of the Metropolitan Police Department arrived at the scene approximately forty-five minutes later, and saw Toy, in the driver's seat, bent over the dashboard as though he were removing the car radio. Efforts at the scene and later at the Traffic Division to have Toy take a breathalizer test proved unavailing and he was taken to D.C. General Hospital for a blood test. While at the Traffic Division, Toy became disruptive and belligerent, jumping up and down on his chair, cursing and screaming in a loud voice. Officer Milton James testified that at one point Toy also banged his head against the wall and said, "Why me, God?" James stated that this kind of behavior was not unusual for persons who are arrested for driving under the influence. At the hospital, Toy generally behaved in a calmer, non-belligerent manner, although he remained somewhat boisterous.

Two blood samples taken from Toy showed blood alcohol levels of .28 and .27%. According to Dr. Robert Reisch, the chief toxicologist at the Office of the Chief Medical Examiner of the District of Columbia who was qualified as an expert witness for the District, this level of alcohol ordinarily produces severe intoxication, significant impairment of judgment, and can depress the respiration and heart functions in some individuals.

After the blood sample was drawn, Officer Williams took Toy back to the Traffic Division. According to desk sergeant Officer Daniel Clinesmith, Williams and Toy returned to the police station at approximately 3:50 a.m. After the citation release program was explained to Toy, and he refused to sign the release forms, the rest of Toy's property was removed and Officers Williams and Clinesmith placed Toy in a holding cell. The precise time when Toy was placed in his cell is unclear. Officer James testified that it could have been five or ten minutes after Toy returned to the Traffic Division, but he admitted that he was not sure of the time. Officer Williams testified that it probably took three to four minutes to read Toy the citation release forms and another minute or two to remove Toy's property and escort him to the holding cell.

After Toy was placed in his cell, space was needed for another prisoner. Clinesmith returned to the holding cell area to see if a cell was available and saw that Toy had hanged himself from the bars on the cell door by using his shirt. Clinesmith immediately yelled for Officer John Mahaney to get a cell block key and to come assist him. Clinesmith reached through the bars and attempted to unwrap the shirt from around Toy's neck but was unable to do so until Mahaney, who arrived moments later, lifted Toy up to take some of the weight off the shirt. Clinesmith and Mahaney, assisted by at least one other officer, then tried to get the cell door open. At first the door only opened a couple of inches because the knot that was tied in the shirt around the cell bars was impeding the door's passageway. The officers were finally able to force enough of the shirt material through the bars to yank the door open and Toy was pulled into the hallway of the cell block. Officer Clinesmith estimated that it took about fifteen or twenty seconds to get the cell door open. After checking for a pulse and respiration, Clinesmith went to the front of the police station, called for an ambulance, and then returned to the cell block area, where he saw two officers administering CPR.

Officer David Daniels testified that he went to the cell block in response to the calls for help and arrived as Toy was being removed from his cell. Daniels checked Toy for a pulse and could not find any. Toy's eyes were fixed and he appeared to be dead. Daniels called for an ambulance and began administering CPR in the form of chest compressions starting "probably not 30 seconds" after Toy was on the ground. Daniels testified that Officer Stuart Smith, who he knew to be an emergency medical technician (EMT), arrived a minute or two later, and together they continued CPR, Smith performing mouth-to-mouth resuscitation and Daniels doing chest compressions, until an ambulance crew arrived about seven minutes later.

Officer James testified that he was one of the first three officers who responded to the cell block area and assisted in opening Toy's cell door. James stated that he checked Toy's pulse and, unlike Officer Daniels, was able to discern a faint pulse. James testified that someone administered ammonia capsules and that Toy moved his head in response to the ammonia fumes. James did not administer CPR since it appeared to James that Toy was alive and James believed it was unnecessary to administer CPR to someone who was alive and breathing. James testified that he did not see Officers Clinesmith or Mahaney perform CPR in the three to five minutes that he was down in the cell block area. James stated that he left the cell block area as Officer Smith was arriving and that it

was his understanding that Toy was alive at that point.

Officer Stuart Smith testified that he arrived at Traffic Division with a prisoner and was met at the front door by someone asking if he had a ventibreather[3] in his vehicle. He replied that he was an EMT[4] and, after being told that there was a prisoner in the cell block who was not breathing, proceeded down to the cell block area. Smith stated that when he got to the cell block area he observed about six or seven officers in the immediate vicinity. Smith did not recall seeing any of the officers performing CPR on Toy when he arrived, but he could not rule out that possibility because events were happening so quickly. Smith checked Toy, found no pulse or respiration, and then commenced mouth-to-mouth resuscitation on Toy while Officer Daniels performed chest compressions. Smith testified that he started mouth-to-mouth resuscitation at approximately 4:15 a.m. and that he and Daniels continued CPR until an ambulance arrived fifteen or twenty minutes later.[5]

Toy was then taken to Howard University Hospital and was admitted to the emergency room at 4:45 a.m. Hospital records reflect that when Toy arrived at the hospital he exhibited no pulse or respiration, but a pulse reappeared at 5 a.m. following treatment by a hospital cardiac respiratory team. Toy never regained consciousness, however, and he remained in a coma for thirteen months until he died on November 30, 1983.[6]

3. A ventibreather is a plastic tube device used to assist in mouth-to-mouth resuscitation that avoids the need for direct physical contact.

4. Smith described himself as having the same certification as a basic ambulance technician but having less training than a paramedic.

5. Officer Mahaney did not testify at trial. A written police statement filed by Mahaney about eight hours after the events took place, was admitted into evidence. The report indicates that Mahaney heard Clinesmith's call for help just before 4:10 a.m. After Toy was freed from his shirt and moved into the hallway, Mahaney ran back to the station area and grabbed a box of ammonia capsules. After Clinesmith reported that he could not detect a pulse, Mahaney crushed six or seven ammonia capsules against

Toy's nose but got no response. Officer Daniels arrived at this time and began CPR with Smith.

Officer Charles Mattingly, also present at Traffic Division at the time of the incident, did not testify at trial. His written police statement filed about nine hours after the events took place states that Toy was taken back into the cell block area at approximately 4:00 a.m. and that a few minutes more than a five-minute period elapsed before Clinesmith discovered Toy.

6. Dr. Donald Wood, Toy's treating physician, testified that he diagnosed Toy's condition as severe hypoxia, or lack of oxygen in the blood, due to asphyxiation. He described the cause of death as anoxic encephalopathy, or deprivation of oxygen to the brain, and complications thereof. Dr. Wood explained that when a person,

Robert diGrazia testified on the Toys' behalf as an expert in the field of criminal administration. Mr. diGrazia testified that the District of Columbia did not follow reasonable police practices and procedures in three relevant respects: (1) failure to render proper assistance, (2) lack of proper emergency equipment, and (3) false arrest. According to Mr. diGrazia, the District was negligent in two respects in the manner in which the officers responded to Toy's situation after he was discovered hanging. He stated that the officers should have rendered assistance to Toy in the form of CPR or mouth-to-mouth resuscitation immediately after he was found, or at least within four minutes. National standards recognized that the failure to commence assistance within four minutes could result in extensive brain damage. On cross-examination, Mr. diGrazia acknowledged that cardiopulmonary resuscitation would have been inappropriate to the extent that Toy exhibited a pulse, but contended that mouth-to-mouth resuscitation would have been appropriate even if Toy was breathing shallowly when he was found. Mr. diGrazia stated that all of his testimony was to a reasonable degree of professional certainty.

In addition, Mr. diGrazia testified that the District of Columbia should have been equipped with oxygen or other equipment that would assist in providing mouth-to-mouth resuscitation. Mr. diGrazia also stated, over objection, that the District of Columbia falsely arrested Toy because the offense for which he was arrested was a misdemeanor which did not occur in the presence of the arresting officer.

### B.

At the close of appellants' case, the District moved for a directed verdict. The District argued that there was no evidence that the District had violated any duty owed to Toy and that Toy had not been falsely arrested. The trial court ruled that there was no evidence to support a finding that the District was negligent in failing to anticipate that Toy would hang himself and directed a verdict on this theory of liability. The court denied the District's motion for a directed verdict in all other respects, and denied the District's motion once again when it was renewed at the close of all the evidence.

The jury found for the District under three theories of liability: false arrest, failure to seek medical attention for Toy at D.C. General Hospital, and failure to properly supervise Toy at the Traffic Division. The jury found for appellants on two theories of liability: failure to equip the Traffic Division properly with emergency equipment and failure to respond properly to Toy's hanging. The jury also found for the District on the defense theories of contributory negligence and assumption of risk. However, the jury found that the District had the last clear chance to prevent the injury to Toy.

The District of Columbia moved for a judgment notwithstanding the verdict, or in the alternative, for a new trial or remittitur, which the trial court granted, finding, in relevant part, that (1) there was no competent medical testimony to sustain the jury finding that the District of Columbia had the last clear chance to sustain Toy's life after he was discovered hanging, (2) the jury findings of contributory negligence and assumption of risk had been proven by a preponderance of the evidence, (3) the jury's finding that the District of Columbia failed to equip the Traffic Division properly with emergency equipment was not supported by the preponderance of the evidence because Mr. diGrazia's testimony consisted largely of his own personal opinion and was not predicated upon known national standards, and (4) the jury's finding that the police officers failed to respond promptly to Toy's hanging and thereby failed to sustain his life had not been proven by a preponderance of the evidence.[7]

---

like Toy, is deprived of oxygen, he begins to lose consciousness in three to four minutes and irreversible damage to the central nervous system occurs in eight to ten minutes.

7. The court also found as a matter of law that, under the circumstances of Toy's hanging, the police did not have a duty to administer CPR and thereby risk exposure to infectious diseases.

II

The plaintiff in a negligence action bears the burden of proof on three issues: "the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury." *Meek v. Shepard*, 484 A.2d 579, 581 (D.C.1984); *District of Columbia v. Davis*, 386 A.2d 1195, 1200 (D.C.1978). Thus, at the outset, to establish a prima facie negligence case, the plaintiff must prove that the defendant deviated from the applicable standard of care. *District of Columbia v. Peters*, 527 A.2d 1269, 1273 (D.C.1987); *Bell v. Jones*, 523 A.2d 982, 987 (D.C.1986). Proof of a deviation from the applicable standard of care need not include expert testimony where the alleged negligent act is "within the realm of common knowledge and everyday experience." *District of Columbia v. White*, 442 A.2d 159, 164 (D.C.1982) (quoting *Matthews v. District of Columbia*, 387 A.2d 731, 734–35 (D.C.1978)); *Gaither v. District of Columbia*, 333 A.2d 57, 60 (D.C. 1975). However, a plaintiff is required to put on expert testimony where the subject presented is "so distinctly related to some science, profession, or occupation as to be beyond the ken of the average layperson." *District of Columbia v. Peters, supra*, 527 A.2d at 1273; *District of Columbia v. Davis, supra*, 386 A.2d at 1200 (citing *Waggaman v. Forstmann*, 217 A.2d 310, 311 (D.C.1966)); *see also Jenkins v. United States*, 113 U.S.App.D.C. 300, 306, 307 F.2d 637, 643 (1962) (whether testimony would aid trier-of-fact in search for truth). If at the close of the plaintiff's case, the plaintiff fails to present sufficient evidence to establish the applicable standard of care, the trial court must direct a verdict for the defendant. *Meek v. Shepard, supra*, 484 A.2d at 581; *Hughes v. District of Columbia*, 425 A.2d 1299, 1302 (D.C.1981). In reviewing a trial court's order granting a judgment notwithstanding the verdict, we must view the evidence in the light most favorable to the prevailing party, and we may affirm only if no reasonable juror could reach a verdict in that party's favor. *Oxendine v. Merrell Dow Pharmaceuticals, Inc.*, 506 A.2d 1100, 1103 (D.C.1986); *Hughes v. District of Columbia, supra*, 425 A.2d at 1300.

■ Appellants contend, and the District does not dispute, that the police officers in the Traffic Division owed Toy a duty of reasonable care under the circumstances as an arrestee under their custody and control. D.C.Code § 24–442 (1988 Supp.) provides that the District of Columbia Department of Corrections is "responsible for the safekeeping, care, protection, instruction, and discipline of all persons committed" at the Workhouse at Occoquan in Virginia, the Lorton Reformatory in Virginia, and the Washington Asylum and Jail. *See also* D.C.Code § 24–407 (1981) ("The Jail of the District of Columbia and the Washington Asylum of said District shall be combined as 1 institution, known as the Washington Asylum and Jail."). We have previously held that D.C.Code § 24–442 implicitly recognizes the common law rule which imposed upon prison authorities a duty to exercise reasonable care under the circumstances in the protection and safekeeping of prisoners. *District of Columbia v. Mitchell*, 533 A.2d 629, 639 (D.C. 1987); *Haith v. District of Columbia*, 526 A.2d 17, 19 (D.C.1987); *Hughes v. District of Columbia, supra*, 425 A.2d at 1302. Although this statutory provision expressly applies only to officials of the Department of Corrections for the care of inmates at the aforementioned facilities, we agree with the District, which concedes that its officers were under a duty to exercise reasonable care under the circumstances, and hold that the common law principles encompassed by § 24–442 apply equally to all persons, like Toy, who are under arrest and in the custody and control of members of the Metropolitan Police Department. *See, e.g., Wilson v. City of Kotzebue*, 627 P.2d 623, 628 (Alaska 1981) (jailer owes duty to prisoner to exercise reasonable care for protection of life and health) (citing cases);

---

The court also found that the jury verdicts were excessive and the product of passion and prejudice and therefore granted the District a new trial in the event that the court's judgment notwithstanding the verdict was reversed on appeal. We express no opinion on these findings.

see also RESTATEMENT (SECOND) OF TORTS § 314A (1965); W. KEETON, D. DOBBS. R. KEETON & D. OWEN, PROSSER AND KEETON ON THE LAW OF TORTS § 56, at 376 & n. 38 (5th ed. 1984).

▮ Appellants also rely on Section I(D)(13) of the District of Columbia Metropolitan Police Department General Order 201.26 (Revised Oct. 16, 1977) as evidence of the standard of care owed by the police officers to Toy. Section I(D)(13) provides that "When a prisoner is unconscious from any cause, members should immediately endeavor to restore consciousness. An unconscious person shall not be placed in a cell but shall be immediately transported to a medical facility for examination by a doctor." In our view, this policy directive, promulgated by the Chief of Police to guide the actions of police officers in the arrest and processing of law violators, is written in such general language [8] that it does not create a standard of care beyond the common law duty to exercise reasonable care under the circumstances to unconscious persons in police custody. Cf. Martin v. George Hyman Constr. Co., 395 A.2d 63, 69 (D.C.1978) (regulation may clarify and define elements of reasonable care without increasing the protection due to the protected class).

▮ In the instant case, the question whether the District of Columbia was negligent in failing to respond properly once the police officers in Traffic Division discovered Toy hanging could be answered only if the jury was informed of recognized standards regarding the proper correctional procedures under the circumstances. See District of Columbia v. Peters, supra, 527 A.2d at 1273; Hughes v. District of Columbia, supra, 425 A.2d at 1299 ("The question of whether prison officials acted reasonably to secure the safety of an inmate is not one within the realm of the everyday experiences of a lay person."). More specifically, the jury could not have resolved the issue whether the police offi-

cers acted reasonably under the circumstances absent expert testimony regarding the proper method for administering CPR and the circumstances under which CPR is appropriate. Appellants concede that the issue of what standard of care the police officers owed to Toy once he was found hanging involved matters requiring expert testimony and rely on Mr. diGrazia's testimony. The District responds that Mr. diGrazia's testimony was insufficient to establish the applicable standard of care and that no other expert testimony was presented on this threshold issue.

▮ Mr. diGrazia testified that the District's police officers negligently treated Toy once he was discovered hanging because the Traffic Division lacked oxygen and other emergency equipment such as ventibreathers needed to assist in administering mouth-to-mouth resuscitation. Where expert testimony is necessary, however, it is not sufficient if it consists merely of the expert's opinion as to what he or she would do under similar circumstances. Bell v. Jones, supra, 523 A.2d at 989; see Murphy v. United States, 209 U.S.App. D.C. 382, 396, 653 F.2d 637, 651 (1981). For example, in District of Columbia v. Peters, supra, 527 A.2d 1269, the court found the testimony of the plaintiff's criminology expert sufficient to establish the proper standard of care where the expert testified that "many police departments train their officers to handle mentally disturbed persons and persons under the influence of drugs. He also gave as examples specific law enforcement agencies which provide such training." Id. at 1273 (emphasis added). Thus, the expert in Peters gave the jury a factual basis for determining a standard of care beyond the expert's personal opinion of what he or she would do under similar circumstances. See Meek v. Shepard, supra, 484 A.2d at 579.

▮ In the instant case, by contrast, Mr. diGrazia did not provide any basis for his opinion that national standards required

---

8. It is clear that "restoring consciousness" cannot be equated in any straightforward way with administering CPR; undoubtedly there exist many circumstances in which a person is un-

conscious but nevertheless maintains normal breathing and heart functions, e.g., an intoxicated person who has passed out.

the District to have oxygen and other emergency equipment available at the Traffic Division. Although Mr. diGrazia testified that he had reviewed a booklet published by the American Correctional Association Accreditation Program and a suicide report by the National Center of Institutions and Alternatives in preparation for his testimony, generally he did not refer to these or any other written standards or authorities as support for his opinion regarding emergency equipment. Unlike the expert in *Peters*, Mr. diGrazia gave no indication of how many police departments throughout the country have this type of emergency equipment available in their police stations or holding cells. Indeed, Mr. diGrazia named only one police department, Boston, Massachusetts (where he had been police commissioner), where oxygen and ventibreathers were available near cell blocks.[9] One instance of a police department with emergency equipment is plainly insufficient to provide a factual basis for an expert opinion that the national standard of care requires police departments to maintain resuscitation equipment. *See Capitol Hill Hosp. v. Jones*, 532 A.2d 89, 94 (D.C.1987) (expert testimony on national standard of care); *District of Columbia v. Barriteau*, 399 A.2d 563, 569 (D.C.1979) (expert testimony must have proper factual foundation and be based upon evidence in record).

■ Mr. diGrazia also asserted that the District was negligent because the police officers in the Traffic Division failed to apply cardiopulmonary or mouth-to-mouth resuscitation quickly enough after Toy was discovered hanging. According to Mr. diGrazia, national standards required that the police officers be trained to render assistance to unconscious individuals in custody in the form of cardio-vascular or mouth-to-mouth resuscitation within four minutes. The evidence was clear, however, that the officers in Traffic Division were CPR trained and that they commenced a continuing series of actions to assist Toy as soon as they discovered him. Officers Clinesmith and Daniels immediately called for ambulances. Officers Daniels and James checked Toy's pulse as soon as he was pulled out of his cell, and Officer Smith checked it as soon as he arrived on the scene moments later. Officer Mattingly applied ammonia capsules. According to Officer Daniels, he started cardiopulmonary resuscitation no more than thirty seconds after Toy was removed, and Officer Smith commenced mouth-to-mouth resuscitation a minute or two later. Even Officer James, who elected not to perform CPR, did so based upon his determination that Toy was breathing and exhibited a pulse.

Thus, appellants' evidence, even when viewed in the light most favorable to them,[10] did not establish that the officers' conduct failed to comply with any general requirement to quickly render assistance to Toy. Any determination of negligence on the part of the officers who treated Toy had to be based on their specific treatment decisions, choices that were made under extreme time pressure and emergency conditions by nonmedical personnel.

■ On this point, Mr. diGrazia opined that, quite apart from the national standard requiring police to render assistance within four minutes, the police officers were negligent because they failed to

9. Mr. diGrazia also testified that oxygen and ventibreathers were not available at police stations in Montgomery County, Maryland, when he was police commissioner there.

10. Contrary to appellants' assertions, the evidence did not show that "[n]o life-saving efforts were made by the officers until Officer Smith arrived." The full extent of Officer James' testimony was that he did not observe Officers Clinesmith or Mahaney administer CPR during the three to five minutes that James was in the holding cell area. Officer Clinesmith's testimony that he did not see any of the officers present administer CPR was specifically directed to the first few moments after Toy was freed; Clinesmith stated that he saw two officers performing CPR when he returned after calling for an ambulance. Thus, neither this nor any other testimony contradicted Officer Daniels' testimony *that he began chest compressions on Toy no more than thirty seconds after Toy was freed* from his shirt and that Smith assisted him with mouth-to-mouth resuscitation a minute or two later. In addition, it is clear that at least two officers called for ambulances and that ammonia capsules were applied sometime before Daniels started performing chest compressions.

immediately commence cardiopulmonary or mouth-to-mouth resuscitation. However, the trial court did not qualify Mr. diGrazia to testify as an expert witness on the proper administration of CPR, but rather as an expert witness in the field of criminal administration. While Mr. diGrazia's substantial experience in the criminal justice field qualified him to render opinion testimony on general police procedures, it did not also qualify him to render opinion testimony as to the proper administration of CPR. See Dyas v. United States, 376 A.2d 827, 832 (D.C.), cert. denied, 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977) (witness must possess sufficient skill, knowledge or experience in field to be qualified as expert witness). On the contrary, Mr. diGrazia's qualifications did not reveal any particular expertise in first aid or in training police officers in first aid. Mr. diGrazia testified that he had taken a CPR course, but he specifically disclaimed any medical expertise in the subject. Mr. diGrazia's CPR training was no different from that received by most of the other officers, all of whom testified that they had received CPR training; indeed, Mr. diGrazia had considerably less CPR expertise than Officer Smith, a licensed EMT.[11] Since Mr. diGrazia was not qualified as an expert in CPR, his testimony alone was necessarily insufficient to establish the applicable standard of care as to the circumstances and proper administration of CPR, and appellants presented no other expert testimony on this critical issue of the standard of care.

In sum, the central issue in this case was whether the police officers in the Traffic Division administered CPR correctly after they discovered Toy hanging in his cell. Appellants bore the burden of proof on this threshold issue and expert testimony was necessary because the manner in which CPR is administered is a matter which is beyond the knowledge of the average layperson. Although several lay witnesses testified regarding their understanding of the specifics of CPR, no expert testimony on this issue was presented. "Absent such testimony, the jury will be forced to engage in idle speculation which is prohibited." Hughes v. District of Columbia, supra, 425 A.2d at 1303 (citing Jones v. Safeway Stores, Inc., 314 A.2d 459, 460–61 (1974). Without affirmative evidence of the applicable standard of care, which could only have been provided by expert testimony, there was no basis for the jury's finding of negligence, and the trial court should have granted the District's motion for a directed verdict. Meek v. Shepard, supra, 484 A.2d at 582. Accordingly, we affirm the order of the trial court granting the District's motion for judgment notwithstanding the verdict.[12]

11. Contrary to Officer Smith, Mr. diGrazia defined CPR as only consisting of the performance of chest compressions. He stated that it was his belief that mouth-to-mouth resuscitation is not part of CPR. Mr. diGrazia also testified that mouth-to-mouth resuscitation would be appropriate for someone who was having difficulty breathing. Officer Smith, on the other hand, stated that he would not consider mouth-to-mouth resuscitation appropriate treatment for someone who was breathing shallowly because it might interfere with the natural breathing rhythm. While Officer Smith's training and experience might have been sufficient to permit his qualification as an expert witness in CPR, cf. Hake v. Manchester Township, 98 N.J. 302, 314, 486 A.2d 836, 843 (1985), appellants did not seek to have Smith testify as an expert witness.

12. Appellants' contention that the trial court erred in its instructions to the jury on false arrest is without merit. The trial court properly instructed the jury that no false arrest occurred if a District of Columbia police officer observed Toy in the driver's seat of his car while intoxicated. See Schram v. District of Columbia, 485 A.2d 623, 625 (1984); Taylor v. United States, 259 A.2d 835, 838 (D.C.1969).