The **AMERICAN UNIVERSITY**, Petitioner,

v.

**DISTRICT OF COLUMBIA COMMISSION ON HUMAN RIGHTS**, Respondent.

**No. 90–470.**

District of Columbia Court of Appeals.

Argued April 25, 1991.
Decided Oct. 17, 1991.

---

Benjamin P. Lamberton, with whom William T. Irelan and Anthony C. Morella, Washington, D.C., were on the brief, for petitioner.

Martin B. White, Asst. Corp. Counsel, with whom Herbert O. Reid, Sr., Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief for respondent.

Before FARRELL and WAGNER, Associate Judges, and GALLAGHER, Senior Judge.

WAGNER, Associate Judge:

American University (the "University") petitions for review of a decision of the District of Columbia Commission on Human Rights (the "Commission") finding that the University discriminated against its former employee, Marionette Phelps, (the "complainant")[1] because it fired her for poor job performance without making reasonable accommodation for her handi-

---

1. The complainant did not seek to intervene in this proceeding. *See* D.C.App.R. 15(f).

cap (manic-depressive syndrome). The principal issues resolved against the University by the Commission in reaching its decision and presented here for review are: (1) whether substantial evidence supports the Commission's determination that complainant suffered from a mental disablement for which reasonable accommodation could be made within the meaning of D.C.Code § 1–2502(23) (1987); (2) whether the Commission's conclusion that complainant established a prima facie case of discrimination under D.C.Code § 1–2512(a)(2) (1987) rationally follows from its findings; (3) whether the University had a duty, before firing complainant, to ascertain if she was affected by a disability which could be accommodated; and (4) whether the University was required to offer complainant a "firm choice" between treatment and termination before firing her. We answer each of these questions in the negative, and reverse the decision of the Commission.

### I.

The complainant filed a complaint of discrimination against the University on June 14, 1982, with the D.C. Commission on Human Rights under the Human Rights Act of 1977, D.C.Code § 1–2502 *et seq.* (1981). Complainant alleged that petitioner terminated her employment unlawfully because of her race (Black) and handicap (manic-depressive syndrome). A hearing on the complaint was held on December 9, 1986, and on January 19, 1988, the hearing examiner issued proposed findings of fact and conclusions of law recommending dismissal of the complaint, having found no unlawful discrimination on either of the two grounds asserted. The Commission affirmed the hearing examiner's findings and conclusion that the University did not discriminate against complainant because of her race; however, it rejected the examiner's conclusion on the claim of discrimination based on handicap. The Commission found that complainant had established that termi-

nation of her employment resulted from discrimination by the University based on mental disablement in violation of the Human Rights Act. Therefore, the Commission ordered complainant's reinstatement with back pay, adjusted for money received from other employment. The Commission also ordered the University to cease and desist from failing to accommodate individuals with similar handicaps.

### II.

Unless otherwise indicated, the pertinent facts as found by the Commission are undisputed. Ms. Phelps was hired by the University in November 1978, as an administrative secretary in the University's Center for Financial Management, which later became the Institute for Applied Public Financial Management (the "Institute"). Prior to applying for the position, Ms. Phelps had been diagnosed as manic-depressive, a condition which resulted in her retirement on full disability from the District of Columbia government.[2] In response to a question on the employment application, she disclosed a prior hospitalization, and she explained to Professor Raymond Einhorn, who hired her, that she was suffering from depression for which she required treatment.[3] Professor Einhorn told Ms. Phelps that he had consulted with the personnel office and that her condition posed no problem to her employment. To accommodate the complainant's condition, Professor Einhorn modified her work schedule to seventy-six hours every two weeks instead of eighty hours, allowing time for her to attend psychotherapy sessions on Wednesday mornings. The modified schedule was included in complainant's personnel appointment forms, and she maintained the schedule until she was fired.

Professor Einhorn, the Institute's Director, supervised the staff, including Ms.

---

**2.** At all times pertinent to these proceedings, Ms. Phelps received monthly disability retirement income from the District of Columbia government.

**3.** Although the Commission found that Ms. Phelps disclosed to Professor Einhorn the specific diagnosis (*i.e.,* manic-depressive), the record reflects only that she told him she suffered depression and had to go for treatment.

Phelps. In the fall of 1979, Dennis Spyra became Assistant Director for the Institute, and thereafter, both Professor Einhorn and Mr. Spyra jointly supervised the staff. However, at the time of the hearing, the complainant testified that Professor Einhorn was her sole supervisor until the last two months of her employment. Until late 1981, Mr. Spyra and the complainant had a good working relationship, although he noticed that complainant was moody and required special consideration by other staff members. Neither Professor Einhorn nor Ms. Phelps ever shared with Mr. Spyra information regarding Ms. Phelps' mental condition, and Professor Einhorn discouraged inquiries into the matter, instructing Mr. Spyra that staff should work around her.

Ms. Phelps received satisfactory evaluations from Professor Einhorn, who never complained about her work. She was promoted to Administrative Assistant in 1979 and thereafter received salary increases based on work performance. Due to ill health, Professor Einhorn was frequently away from the office, and Mr. Spyra assumed full supervisory authority in his absence. In January 1982, Professor Einhorn left the Institute, and Mr. Spyra was appointed Acting Director.

Commencing in late 1981 and continuing into the spring of 1982, Ms. Phelps' moodiness and problems with staff became more pronounced. Her job performance deteriorated, and Mr. Spyra noticed that she appeared drowsy, unmotivated, and short-tempered. Ms. Phelps' job was important to the smooth operation of the office, as she coordinated activities and handled the telephones, filing, typing and reception. Ms. Phelps' behavior caused friction with members of the small staff (four or five), who became reluctant to approach her for work related matters. Although Mr. Spyra suspected that Ms. Phelps might have a medical problem, he did not question her about it because he believed it to be a personal matter. Indeed, Ms. Phelps was taking prescribed medication for her manic-depressive condition. Ms. Phelps did not discuss her condition with Mr. Spyra because she felt it was not his business.

Complainant's behavior and job performance was affecting the morale and productivity of the office, and Mr. Spyra tried to discuss the problem informally with her, but she refused.[4] Upon the advice of a friend in the personnel office, Mr. Spyra undertook more formal action. To that end he met with Ms. Phelps on May 13, 1982, but again she refused to discuss the matter, contending that her performance was satisfactory. On May 17, 1982, Mr. Spyra wrote a letter to Ms. Phelps outlining her deficiencies as mentioned at the meeting, including poor attitude toward work and staff, poor quality of work (i.e., typing, scheduling, etc.), inability to discharge job responsibilities without supervision, sleeping on the job, poor motivation, and screaming at staff, supervisor and other University employees. In that letter, Mr. Spyra also expressed doubts about Ms. Phelps' ability to continue at the Institute because of her refusal to discuss the problems rationally.

Mr. Spyra approached Ms. Phelps the next day about the difficulties, but she again rebuffed him. Therefore, Mr. Spyra presented her with the alternative of resigning or being terminated. By letter dated May 21, 1982, Ms. Phelps informed her supervisor that she would not resign, and Mr. Spyra responded orally that he would terminate her. On May 25, 1982, he gave her a letter notifying her that she would be terminated on May 26, 1982, for the following reasons, which were elaborated upon fully: deficiencies in overall job performance; poor attitude toward work; disrespect for the supervisor based on numerous verbal outbursts; throwing memos; and failing to observe warnings. An actual termination date of June 11, 1982, was established by the University, and complainant was given administrative leave in the

---

**4.** When and how frequently Mr. Spyra made such attempts are the subject of disputed findings of the Commission, addressed *infra.*

interim.[5] Ms. Phelps met with the University's Director of Personnel and its personnel officer on May 24, 1982. When she became upset about the prospect of losing her job, the Personnel Director referred her to the University Counseling Center.

To terminate an employee involuntarily, the University's personnel policy requires a determination by the employee's immediate supervisor, *inter alia,* that the employee is unable or fails or refuses to maintain fitness for satisfactory performance and that the employee's conduct impairs the effectiveness of the University's operations. Under the policy the supervisor must give the employee timely notice of the problem and, with the assistance of the office of personnel, try to assist the employee to maintain or recover effectiveness or find a more compatible position. The employee is entitled to two weeks notice prior to the effective date of separation.

Crediting the testimony of Mr. Spyra, the hearing examiner determined that he had attempted to discuss with complainant her work performance on numerous occasions between January 1, 1982 and May 17, 1982. The examiner also found that the meetings were undertaken to assist the complainant in improving her performance, but she refused to cooperate, believing that she had no deficiencies. Therefore, the hearing examiner concluded that Mr. Spyra had given complainant timely notice of the problems and attempted to find a resolution for them. Although these findings were supported by substantial evidence, the Commission rejected them and substituted its own. The Commission found that the time between the discussions and the date of termination was only a few weeks, which was insufficient time for the employee to alter the deficiencies.

Based on these conclusions, the Commission concluded that the complainant had established a prima facie case of discrimination based on mental disablement under the Human Rights Act. Although the Commission concluded that the University presented evidence justifying complainant's termination, it found that its explanation was a pretext for unlawful discharge. It concluded that Professor Einhorn's knowledge of complainant's handicap was imputed to the University, and the accommodations made for it were insufficient. Although finding that complainant concealed her condition, the Commission held that Mr. Spyra's failure to ascertain complainant's condition or to offer her a "firm choice" between seeking treatment for her illness and termination amounted to a failure to make a reasonable accommodation for complainant's handicap as required under the Human Rights Act.

### III.

In reviewing an agency's decision, this court must determine: (1) whether the agency has made factual findings on each material contested issue; (2) whether such findings are supported by substantial evidence of record; and (3) whether the legal conclusions reached flow rationally from the findings. D.C.Code § 1–1509(e) (1987); *Levy v. District of Columbia Bd. of Zoning Adjustment,* 570 A.2d 739, 746 (D.C.1990) (citations omitted); *see also Cohen v. Rental Housing Comm'n,* 496 A.2d 603, 605 (D.C.1985). We conclude that the Commission's factual findings on certain material contested issues are not supported by substantial evidence of record and that its findings do not support the legal conclusion that petitioner unlawfully discharged the complainant because of her handicap.

### IV.

We resolve first petitioner's challenge to the Commission's substitution of its own finding for that of the hearing examiner, *viz.,* that the time between the supervisor's efforts to discuss job deficiencies with the complainant and her discharge was only a few weeks. Petitioner argues that the record does not support the Commission's rejection of the hearing examiner's finding to the contrary. We

---

**5.** Subsequent to the termination of her employment by the University, Ms. Phelps earned her teaching certificate and was an elementary school teacher in Chicago, Illinois at the time of the hearing.

agree. Substantial evidence in the record supports the hearing examiner's rejected findings that Mr. Spyra met with complainant and attempted to discuss her job performance numerous times prior to May 17, 1982. In making this finding, the hearing examiner credited the testimony of Mr. Spyra. The examiner also credited portions of the testimony of the complainant "who testified to some of these meetings." However, complainant's evidence was inconsistent on the subject. At one point, she testified that only once prior to May 13, 1982, did Mr. Spyra express concern about her job performance, and she provided a similar written statement. The Commission accepted this evidence in its substituted finding in spite of the evidentiary support for the hearing examiner's finding, made after resolution of credibility issues raised by the differences in the testimony of Mr. Spyra and Ms. Phelps and inconsistencies in Ms. Phelps' evidence. Given these circumstances, we hold that the Commission erred in rejecting the hearing examiner's findings.

■ The statutes and regulations governing proceedings before the Commission provide that a hearing examiner make a recommended decision, while the Commission makes the final one. *Harris v. Commission on Human Rights*, 562 A.2d 625, 630 (D.C.1989) (citing D.C.Code §§ 1–2550, –2553(c) and Rules of Procedure for Contested Cases § 105.1, 31 D.C.Reg. 6267 (1984)). The Commission's scope of review of the hearing examiner's proposed decision is not limited to a determination of whether his findings are supported by substantial evidence. *See id.* However, when the Commission rejects the hearing examiner's findings or substitutes its own credibility findings for those of the examiner, it must specify its reasons for doing so. *Id.* This requirement assures meaningful review and exposes any arbitrary or capricious action to careful scrutiny. *Cinderella Career & Finishing School, Inc. v. FTC*, 138 U.S.App.D.C. 152, 158, 425 F.2d 583, 589 (1970).

Our standard of review of the Commission's decision remains a determination of whether its factual findings are supported by substantial evidence in the record. *Harris, supra,* 562 A.2d at 630. In our review, however, we also consider that it is the hearing examiner, and not the Commission, who observes the witnesses in making credibility findings. *Id.* Therefore, it is incumbent upon the agency to persuade the reviewing court that the issue could be decided without a credibility determination by the hearing examiner. *Id.* (citing *Stevens Chevrolet, Inc. v. Commission on Human Rights*, 498 A.2d 546, 549–50 (D.C.1985)).

The Commission has not made that showing. Because of the inconsistencies between the testimony of the witnesses on the issue and the inconsistencies in Ms. Phelps' evidence, the hearing examiner necessarily made a credibility determination in finding in accordance with the testimony of Mr. Spyra. No reason is provided for the Commission's rejection of the examiner's finding that the supervisor attempted discussions numerous times between January 1, 1982 and May 17, 1982, except its statement that the record does not support it. The record shows that the Commission is clearly wrong in its observation. Moreover, this error was significant because it undermines the Commission's conclusion, see Part VII, *infra,* that the University made no efforts to ascertain the source of complainant's poor performance "in order for her to find a way to recover."

Therefore, we hold the Commission's rejection of the examiner's finding and substitution of its own was arbitrary and must be set aside in favor of the examiner's findings. We turn then to petitioner's argument that the Commission's conclusion of law that the complainant made out a prima facie case of discrimination does not follow rationally from its findings of fact.

## V.

■ The Human Rights Act prohibits an employer from discharging an employee based wholly or partially upon discriminatory reasons, including physical handicap. D.C.Code § 1–2512(a)(1) (1987). A physical handicap under the Act is defined as "a

bodily or mental disablement which may be the result of injury, illness or congenital condition for which reasonable accommodation can be made." D.C.Code § 1–2502(23) (1987). Thus, the statutory definition requires more than a showing that one has a mental illness. To come within the Act's protection, a complainant must first prove that he or she has a mental disablement for which reasonable accommodation can be made. *Id.* The Commission's factual finding that the complainant met this initial burden is not supported by substantial evidence, and its legal conclusion that complainant was handicapped within the meaning of the statute does not flow rationally from its findings. Before turning to the reasons for this determination, we address briefly the general allocations of burdens of proof in cases arising under the Act.

■ In deciding cases brought under the Act, we follow the allocations of burdens and order of proof prescribed for cases brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1982). *Rap, Inc. v. District of Columbia Comm'n on Human Rights*, 485 A.2d 173, 176 (D.C.1984); *Miller v. American Coalition of Citizens*, 485 A.2d 186, 189 (D.C.1984). First a complainant must prove by a preponderance of the evidence a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). If that burden is met the defendant or employer must produce evidence of a nondiscriminatory reason for its action. *Id.* If the employer makes that showing, the complainant must then demonstrate that the reason offered is a pretext for discrimination. *Id.* at 804, 93 S.Ct. at 1825. However, in clarifying *McDonnell Douglas*, the Supreme Court held that "[t]he ultimate burden of persuading the trier of fact that the defendant intentional-

ly discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1982). Likewise, this court has so held. *Rap, Inc., supra,* 485 A.2d at 176.

The nature of the proof required to establish a prima facie case varies with the type of discrimination alleged. *Texas Dep't of Community Affairs, supra,* 450 U.S. at 253–54 n. 6, 101 S.Ct. at 1094 n. 6 (quoting *McDonnell Douglas, supra,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13.) [6] We have previously considered the type of proof required in claims for discrimination based on handicap and looked to cases under the analogous federal statute for guidance in doing so. *Miller, supra,* 485 A.2d at 190. In *Miller,* we relied upon the requirements for a prima facie case outlined in *Prewitt v. United States Postal Serv.,* 662 F.2d 292 (5th Cir.1981), under which the employee must demonstrate that:

(a) except for his physical handicap, he is qualified to fill the position; (b) he has a handicap that prevents him from meeting the physical criteria for employment; and (c) the challenged physical standards have a disproportionate impact on persons having the same handicap from which he suffers. To sustain this prima facie case, there should also be a facial showing or at least plausible reasons to believe that the handicap can be accommodated or that the physical criteria are not "job-related."

*Id.* at 309–10. Before an employer is obligated to demonstrate that no reasonable accommodation can be made for the employee's handicap, according to *Prewitt,* at a minimum, the employee must show that the handicap prevents him or her from meeting the physical criteria for the job and also make a "plausible showing that

---

**6.** In *McDonnell Douglas,* the Supreme Court outlined how a complainant can make the requisite showing in a case of racial discrimination as follows:

This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii)

that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas, supra,* 411 U.S. at 802, 93 S.Ct. at 1824 (footnote omitted).

reasonable accommodation is possible." *Id.* at 310 n. 25.

## VI.

■ The Commission concluded that complainant had met the initial burden set forth in *Prewitt* and adopted in *Miller.* We disagree. The record does not support the Commission's conclusion that the complainant made the requisite showing to shift to the employer the burden of producing evidence that no reasonable accommodation could be made or that a non-discriminatory reason prompted its action. Although the record supports the Commission's finding and conclusion that the complainant suffered from a mental disablement (manic-depressive syndrome), neither the Commission's findings of fact nor the evidence of record shows that the deficiencies in complainant's job performance were related to her handicap or that reasonable accommodation for her condition was possible.

The complainant provided the only evidence of the relationship of her illness to the performance of the work, and she disclaimed any relationship. Neither medical evidence nor the testimony of other witnesses was offered to prove that complainant's disablement prevented her from performing the job. Complainant made no claim that her pre-existing condition deteriorated nor that some other mental disablement developed. The Commission simply inferred without evidence to support it that the complainant's emotional behavior in early 1982 was caused by her handicap. This conclusion is speculative absent expert testimony or other competent evidence to support it where the complainant specifically testifies to the contrary.

Moreover, there was no plausible showing that reasonable accommodation of complainant's condition was possible. In the face of complainant's disclaimer, some other evidence was required not only to establish the relationship between her condition and the work, but also to show the possibil-

ity that her condition could be accommodated. An employer is not required to hire or retain an employee with an insurmountable handicap. *See Miller, supra,* 485 A.2d at 191; *see also Kimbro v. Atlantic Richfield Co.,* 889 F.2d 869, 879 (9th Cir.1989). Significantly, complainant testified that she was on medication which allowed her to behave in a "normal" way, and she continued psychotherapy throughout her tenure with the University. Nevertheless, she was not performing satisfactorily the responsibilities of the position according to the Commission's findings and the evidentiary record. Since she had been able to do the job for the three years before 1982 while also medicated and undergoing therapy, we are left without proof or explanation of the cause for the change or a basis for concluding that her condition was surmountable or capable of accommodation.[7]

Unlike some other handicaps, the causes and effects of manic-depressive syndrome and the extent to which the symptoms of the illness can be controlled by medication and therapy are beyond the ken of the average lay person. Where proof of an issue is related to a science or profession beyond the ken of an average lay person, expert testimony is required. *See Toy v. District of Columbia,* 549 A.2d 1, 6 (D.C.1988); *see also In re Peek,* 565 A.2d 627, 633 (D.C.1989) (letter from respondent's psychiatrist offering her professional opinion that the attorney's depression substantially affected his misconduct considered most significant in providing substantial evidence in support of the finding). In *Peek,* there was no dispute that the attorney suffered an acute period of depression during the time that his conduct was in issue, and two therapists offered evidence that the attorney suffered from chronic depression. *Id.* Under the circumstances presented here, we conclude that the lack of expert evidence to provide a causal nexus between the complainant's condition and the deficiencies in her work or to offer some showing of the possibility of accommodation was fatal to her prima

---

7. The University, in fact, accommodated complainant's condition disclosed to it upon hiring. Any other condition responsible for her defi-

ciencies was not revealed to the University nor disclosed even during the hearing before the agency.

facie case. The proof fell far short of that necessary to require the employer to show either that no reasonable accommodation could be made under *Prewitt, supra,* 662 F.2d at 310, or to require the employer to articulate a non-discriminatory reason for the firing. *See McDonnell Douglas, supra,* 411 U.S. at 802, 93 S.Ct. at 1824.[8]

To come within the protection of the Human Rights Act, a complainant claiming discrimination based on "physical handicap," which includes mental disablement, must first prove that he or she has a condition which falls within the statutory definition of physical handicap (*i.e.*, mental disablement for which reasonable accommodation can be made). D.C.Code §§ 1–2502, –2512(a)(2). The statutory definition requires more than a showing that one has a mental illness. The Commission's determination that the complainant suffered a mental disablement for which accommodation could be made within the meaning of D.C.Code § 1–2502(23) (1987) is not supported by substantial evidence in the record. Its conclusion that the complainant established a prima facie case of discrimination under D.C.Code § 1–2512(a)(2) (1987) does not follow rationally from the findings made. Therefore, its decision must be reversed. *See Levy v. District of Columbia Bd. of Zoning Adjustment, supra,* 570 A.2d at 746.

### VII.

Petitioner further argues that it was not required to discover the complainant's condition in 1982 nor to offer her a "firm choice" between seeking treatment for her condition or termination. We agree. The basis for the Commission's holding that the University violated the Human Rights Act was its conclusion that the University had a duty to investigate and "discover" complainant's condition and to offer her a firm choice of treatment or firing as a form of reasonable accommodation. We observe at the threshold that the Commission's conclusion that the University "failed to investigate [complainant's] problem in order for her to find a way to recover" is undermined severely by the hearing examiner's finding, which the Commission erroneously set aside, that Mr. Spyra had made repeated attempts to discuss her performance with her during the period in question but that she rebuffed him each time, insisting there was nothing deficient about her work. Moreover, assuming the University should have perceived a connection between her deteriorating performance and her previous mental disturbance, the Commission erred in holding that it was required to present her with a "firm choice" between additional treatment or firing as a reasonable accommodation under the statute.

In fashioning the "firm choice" obligation, the Commission relied upon the decision in *Whitlock v. Donovan,* 598 F.Supp. 126 (D.D.C.1984), *aff'd sub nom. Whitlock v. Brock,* 252 U.S.App.D.C. 403, 790 F.2d 964 (1986).[9] The Commission concedes on appeal that *Whitlock* was decided under a different statute and regulations involving the treatment of an alcoholic employee in the federal government.[10] Nevertheless, it

8. Because of the disposition made of this issue, we do not reach petitioner's claim that the Commission's conclusion that petitioner's reason for the firing was pretextual is erroneous.

9. The Commission also proceeded on the theory of the applicability of the D.C. Office of Human Rights and Commission on Human Rights Employment Guidelines, 33 D.C.Reg. 3114, § 513 (1986), which incorporate by reference the regulations of the U.S. Equal Opportunity Commission in 29 C.F.R. § 1613.701 *et seq.* The cited regulations require reasonable accommodation for known physical and mental handicaps and describe actions constituting reasonable accommodation. 29 C.F.R. § 1613.704. These regulations were not in effect at the time complainant

was terminated, having become effective on August 11, 1986. The Commission does not argue their applicability on appeal, and we need not address the issue.

10. The *Whitlock* court, in considering a claim under the Rehabilitation Act of 1973, as amended 29 U.S.C. §§ 791, 794, derived its "firm choice" requirement for reasonable accommodation for alcoholics from a Federal Personnel Manual System Supplement, 792–2, Alcoholism and Drug Abuse Programs (1980). The court found the relevant statute and regulations to

establish[ ] that when an employee's performance deficiencies are suspected to be due to alcohol, the agency is obligated first to offer counseling to the employee. If the employee

argues the authority of the Commission to impose the same requirement under its authority to determine, in the first instance, what forms of accommodation are reasonable within the meaning of D.C.Code § 1-2502(23). The deference given to an agency's reasonable interpretation of its own governing statute [11] does not extend to the retroactive imposition of affirmative duties on private employers. The establishment of such requirements would constitute rule-making, necessitating compliance with the notice and publication provisions of D.C.Code § 1-1506 (1987) before adoption. *See Rorie v. District of Columbia Dep't of Human Resources*, 403 A.2d 1148, 1153 (D.C.1979). In a decision subsequent to *Whitlock*, the United States Court of Appeals for the District of Columbia Circuit refused to apply the OPM publication relied on in *Whitlock* to impose a "firm choice" requirement on the Library of Congress because it had neither been published in the Federal Register for notice and comment nor codified in the Code of Federal Regulations. *Judd v. Billington*, 274 U.S.App.D.C. 197, 200, 863 F.2d 103, 106 (1988). Moreover, the circuit court found that the language in the manual was precatory rather than mandatory and intended to provide guidance to agencies and departments establishing their own programs. *Id.*

■ Therefore, the Commission's application of the *Whitlock* standard in concluding that the University failed to accommodate reasonably complainant's condition was erroneous.[12] Confronted with an employee who concealed that a physical handicap was the source of her performance

difficulties, the University was not required to investigate to ascertain the nature of such handicap, if any, nor to offer the employee a firm choice between treatment and termination.

For the foregoing reasons, the decision of the Commission finding that the University discriminated against the complainant is reversed, and the Commission is directed to vacate the order for a monetary award and other remedies.

*So ordered.*

---

rebuffs the offer, and if the deficiency in his work is such that discipline would be warranted, the agency should offer a "firm choice" between treatment and discipline. An agency is obligated to follow through with its firm choices.

\* \* \* \* \* \*

If removal seems to be the only feasible option, the agency is obligated to conduct a formal evaluation, including a fitness-for-duty examination if necessary, to confirm whether the employee's alcoholism disease is in fact responsible for the employee's poor performance.

598 F.Supp. at 133–34.

It is questionable, to begin with, whether the "firm choice" approach deemed effective in cases involving alcoholics is appropriate in cases involving individuals suffering from a mental illness. The Commission had before it no evidence that the same type of action would be appropriate or useful in confronting employees suspected of having a mental illness.

**11.** *Bublis v. District of Columbia Dep't of Employment Servs.*, 575 A.2d 301, 303 (D.C.1990).

**12.** Disposition of the issues resolved in favor of the University eliminates the need to consider petitioner's challenge to the remedies imposed.