**Terry E. BUTERA, Individually and as a Personal and Legal Representative of the Estate of Eric Michael Butera, Plaintiff,**

v.

**DISTRICT OF COLUMBIA, et al., Defendants.**

No. CA 98–2794.

United States District Court, District of Columbia.

Dec. 22, 1999.

Peter C. Grenier, James M. Ludwig, Bode & Beckman, LLP, Washington, DC, for Plaintiff.

Thomas Koger, Christine C. Gallagher, Office of Corporation Counsel, Washington, DC, for Defendants.

## MEMORANDUM

JUNE L. GREEN, District Judge.

Before the Court is Defendants' Renewed Motion Pursuant to Fed.R.Civ.P. 50 for Judgment as a Matter of Law, or in the Alternative, Pursuant to Fed.R.Civ.P. 59 Motion for Amendment of the Judgment and for a New Trial, or in the Alternative for Remittitur. The Plaintiff has filed an opposition, and the Defendants, their Reply. Also before the Court is Plaintiff's Post–Verdict Petition for Attorneys Fees and Costs, the Opposition and the Reply thereto. For the reasons that follow, the Defendants' motion is denied and the Plaintiff's Petition is granted.

## BACKGROUND

This case arose out of the beating death of Plaintiff's son Eric Butera while he was serving as an undercover operative for the Metropolitan Police Department ("MPD"). Plaintiff brought this action under civil rights laws, District of Columbia law, and the common law, on the theory that the police acted improperly in failing to protect her son.

On October 5, 1999, the first phase of a bifurcated trial (liability/damages) began. On October 18, 1999, the Jury returned verdicts against the individual police officers on the civil rights claims and against all of the defendants on the negligence-based Wrongful Death Act and Survival Act claims. None of the Defendants were found to be liable under Plaintiff's intentional infliction of emotional distress claim.

The damages phase began immediately thereafter and, on October 20, 1999, the jury returned a total damage award of $98,100,000. The jury awarded $36 million and $34 million against the individual Defendants on the estate's civil rights claims and Plaintiff's own civil rights claims, respectively. The jury also awarded $68,000 on Plaintiff's Wrongful Death Act claims and $462,000 on the Survival Act claims. Punitive damage awards were returned against the District of Columbia in the amount of $27,000,000 for its negligence (the District was not found to be liable under the civil rights claims), and against the individual officers for their conduct in the amount of $142,500 each. Judgment on the verdict was entered on October 21, 1999.

The Defendants now move for judgment as a matter of law (Fed.R.Civ.P.50), or in the alternative to amend judgment and for a new trial (Fed.R.Civ.P.59), or in the alternative for remittitur of the damage award. As grounds, the Defendants state: 1) the Plaintiff did not offer sufficient evidence to establish an allegedly required national standard of care to prove any of her claims that the officers acted improperly; 2) the constitutional tort claims all are untenable because (i) the deceased was never in police custody, (ii) there is no

constitutional right to the companionship of an adult child, and (iii) proximate cause was not proved because there was no evidence that decedent was killed solely because he was working for the police; 3) as a matter of law, punitive damages cannot be awarded against the District of Columbia and, in any event, evidence of Defendants' conduct did not support a punitive damage award against any of the Defendants; 4) remittitur of the damage awards is proper because the compensatory awards for the Wrongful Death Act and Survival Act claims are duplicative with the constitutional tort award and, the awards themselves are excessive in that they exceed the reasonable range within which a jury may operate; 5) Defendants were denied a fair trial because the Court refused to let them call certain witnesses; refused to strike certain testimony by Plaintiff's expert witnesses; refused to allow the Defendants to conduct reasonable cross-examination of witnesses; and refused to instruct the jury on an assumption of the risk defense. The Defendants also move on the basis that the Court abused its discretion by failing to grant their motions for a mistrial after Plaintiff's expert engaged in a conversation with a juror during a break in the proceedings, and later when the Plaintiff's attorney told the jury to "send a message" to the Defendants with its verdict. These issues shall be treated *seriatum*.[1]

## DISCUSSION

### *MOTION FOR JUDGMENT, REMITTITUR OR NEW TRIAL*

Under Fed.R.Civ.P. 50, the Court may 1) let the judgment stand, 2) order a new trial, or 3) direct entry of judgment (for Defendants) as a matter of law. The Court finds nothing in Defendants' motion to justify disturbing the judgment in this case.

## I. TESTIMONY OF PLAINTIFF'S POLICE PRACTICES EXPERT AND THE NATIONAL STANDARD OF CARE

■ Defendant first argues that the Plaintiff did not offer sufficient evidence to establish an allegedly required national standard of care to prove her claims that the officers acted improperly under any theory (negligence or constitutional claims). They state that Plaintiff's police practices expert, James Bradley, did not offer "reliable" evidence on the standard of care because he relied solely on a handbook and manual of the Drug Enforcement Administration ("DEA Handbook and Manual") for his opinion, rather than on information about the practices of other police departments across the country.

The Defendants' interpretation of what is required for a police practices expert to offer an opinion is too narrow. Although the Defendants rely on *Toy v. District of Columbia*, 549 A.2d 1 (1988), which determined that the testimony of the police practices expert was insufficient, that case is not on point with the facts here. In *Toy*, the police practices expert was a former MPD Assistant Chief who testified regarding a standard of care that he asserted required emergency resuscitation equipment near cellblocks for the treatment of inmates (the inmate in *Toy* had hung himself in his cell). The Court of Appeals reversed on the basis that the expert did not refer to any "written standards or authorities as support" and only named one police department where such emergency equipment was maintained. *Id.* at 7–8.

Here, of course, Mr. Bradley, who is a former detective of the MPD, stated that his reliance on the DEA Handbook and Manual was based on several factors including consultation with police officers of the Prince George's County Police, the MPD's practice of sending its officers to the DEA's training school, and his person-

---

1. The Plaintiff's Post–Verdict Petition for Attorneys Fees and Costs shall be treated in a separate section at the end of this Memorandum.

al knowledge that the MPD adheres to the values and beliefs of the DEA in the training they give their officers. Trial Tr., 10/13/99, at 31–32. Mr. Bradley also stated that he relied upon the Narcotics Investigators Manual of the Institute of Police Technology and Management, University of North Florida, where the Metropolitan Police Department conducts training for its officers. *Id.* at 29.

The Court views reliance on such materials as proper to establish a national standard of care. Not only is the DEA a nationwide agency of the Federal Government, but even the Defendant District of Columbia recognizes its standards and expertise, as evidenced by the training its officers receive from the agency. While the "survey" approach discussed in *Toy* concerning the number of police departments in conformance with a purported standard of care has been discussed with approval (albeit in dicta), it certainly is not the only way to establish a national standard of care. In fact, such an approach by itself would be problematic. The Court would be reduced to reviewing the practices of hundreds or thousands of police departments and then setting an arbitrary number with regard to how many constitute a "national standard." That is not the direction in which the Court intends to go.

The Defendants make another assumption here as well—the necessity of a national standard of care. While the Court

recognizes that some standard of care is required in order to show a tortfeasor's deviation therefrom, the Court is not so convinced that a national standard of care is necessary.[2] *See e.g. District of Columbia v. Wilson,* 721 A.2d 591 (D.C.1998). Although *Wilson* was a case brought by a prisoner for medical malpractice, it is instructive. There the District of Columbia Court of Appeals expressly rejected the District's contention that a national standard of care was required and distinguished the line of cases cited (the same line of cases cited here[3]), stating that each of those cases "presented claims that the District was negligent in failing to prevent a prisoner from committing suicide (*Phillips, Clark,* and *Toy*), or to protect a prisoner from assaults by other inmates (*Moreno* and *Carmichael*)." *Wilson* at 599. Here, as well, none of those cases are analogous to these facts, in which the District of Columbia undertook the personal protection of an individual and placed him in a high-risk situation, for their own benefit.

In fact, even without a national standard of care, the types of materials that Mr. Bradley relied upon appeared to the Court then, and now, as the types upon which an expert could reasonably rely to form an opinion.[4] Fed.R.Evid. 703. Not only did these materials provide a proper foundation for expert opinion, but served to assist the jury in making the ultimate determinations in this case. Contrary to what De-

**2.** The Court agrees, however, that expert testimony was necessary here. *Messina v. District of Columbia,* 663 A.2d 535, 538 (D.C. 1995)("While expert testimony regarding the appropriate standard of care is not necessary for acts within the realm of common knowledge and everyday experience, a plaintiff must put on expert testimony to establish what that standard of care is if the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson.")

**3.** *Phillips v. District of Columbia,* 714 A.2d 768, 773–74 (D.C.1998), *Clark v. District of Columbia,* 708 A.2d 632, 635–36 (D.C.1997); *District of Columbia v. Moreno,* 647 A.2d 396, 399 (D.C.1994); *District of Columbia v. Car-*

*michael,* 577 A.2d 312, 314–16 (D.C.1990); and *Toy v. District of Columbia,* 549 A.2d 1, 6–8 (D.C.1988).

**4.** In addition to those materials discussed above (handbook, manual, consultations), Mr. Bradley also relied on the MPD's own General Orders, and the violation of those orders, to show a deviation from the standard of care. Trial Tr., 10/12/99, at 80, 85; *see also District of Columbia v. Banks,* 646 A.2d 972, 975 (D.C.1994)(although decided on other grounds, court noted that expert's testimony on applicable standard of care for terminating police pursuits was established by MPD General Order, training materials and traffic regulations).

fendants suggest, the Court did not abdicate its role as "gatekeeper" under the standard stated in *Kumho Tire v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). After a lengthy voir dire, the following colloquy took place:

MR. GRENIER (Pl's.Counsel): Your Honor, at this time we tender to the Court Mr. James E. Bradley, Jr., as an expert witness in the areas of police procedures and the national standard of care applicable to this operation.

THE COURT: Any voir dire?

MR. KOGER [Def. Counsel]: No, your Honor. We would simply ask for a clarification as to what the national applicable standard of care to this operation is—a definition of this operation for purposes of the jury's understanding.

MR. GRENIER: Well, Your Honor, then I will modify that. I will say that **we tender Mr. Bradley to the Court as an expert in the national standard of care in police procedures, period.** *(Emphasis added.)*

Defense counsel has previously acknowledged that there is a national standard of care applicable to the Butera operation itself and to the incident that brings us here today.

MR. KOGER: **No objection, Your Honor.** *(Emphasis added.)*

THE COURT: **All right.**

Trial Tr., 10/12/99, at 16,17.

The Court was convinced of Mr. Bradley's expertise (as, it appears, were the Defendants) and so qualified him. His ensuing testimony did nothing to change that certification.

## II. DUE PROCESS RIGHTS OF ERIC BUTERA

■ Defendants next attack the "deliberate indifference" standard used to prove Eric Butera's constitutional deprivations. The Defendants state that the deliberate indifference standard discussed in *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), is not applicable here because 1) Eric Butera was not under government restraint or control, 2) his injuries were not caused by government actors, and 3) he was not in custody at the time he was killed. (Mot. at 12.)

The Court has partially addressed this issue already in its earlier Memorandum and Order denying Defendants pre-trial Motion for Summary Judgment. (Mem. and Ord., 7/7/99, 1999.) There, the Court determined that the deliberate indifference standard (rather than the higher "intend to cause harm" standard) was applicable here because the police chase in *Sacramento* was not analogous to the facts here. In so ruling, the Court found that "the [Defendant] officers themselves planned the drug-buy operation in advance and from the safety of their own offices. They were not facing a rapidly evolving situation, and it is disputed whether the drug-buy operation was even necessary to their murder investigation." *Id.* at 9.

Now, however, the Defendants add a new twist to their earlier argument and contend that neither standard (deliberate indifference or intent to harm) is sufficient to find a constitutional deprivation. The Court disagrees.

While it is true that neither the Supreme Court nor the D.C. Circuit has ruled expressly on the viability of a due process claim for those not in police custody (or the equivalent), so too, they have not precluded such a claim. Both the Defendants and Plaintiff cite the case *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), which involved the state's release of a young boy into the custody of his known-to-be abusive father, and who was then viciously beaten to death by the father. The Supreme Court found no due process violation stating that "when [the State] returned [the child] to his father's custody, it placed him in no worse position than that in which he would have been if it had not acted at all." *Id.* at 201, 109 S.Ct. 998. The Defendant's

seize on this statement and argue that the Defendants "did no more than allow [Eric Butera] to return voluntarily ... to a position in which he had repeatedly placed himself before," meaning the residence where he had previously purchased drugs. (Mot. at 15.) Unfortunately for the Defendants, the jury did not accept this characterization of the Defendants' conduct, nor does the Court now.

The evidence (to a large extent undisputed) was that the police enlisted the aid of Eric Butera with a promise of protection, subjected him to a highly dangerous situation, failed to inform him of critical information about those dangers (*i.e.;* the previous night's "drug bust" at the target premises), and failed to follow safety procedures for such an operation. The Defendants' conduct actually had the effect of increasing the danger quotient to Eric Butera. This is not the same as *DeShaney.* Here, the Defendants affirmatively put Eric Butera in a much worse position than he otherwise would have found himself.[5]

The Plaintiff cites the Seventh Circuit's decision in *Monfils v. Taylor,* 165 F.3d 511, 520 (7th Cir.1998), to support this very reasoning. There, the court cited an exception to the custodial relationship requirement, finding that due process could be violated where the state "affirmatively places a particular individual in a position of danger the individual would not otherwise have faced," a so-called "state-created danger" exception.[6] *Id.; see also Kallstrom v. City of Columbus,* 136 F.3d 1055, 1067 (6th Cir.1998)(state may be liable under section 1983 for increasing the risk to an individual of private acts of violence). This reasoning comports with cases from our Circuit as well as the D.C. Court of Appeals, concerning "special relationships" between the police (or rescuers) and the public. *See, e.g., Martin v. Malhoyt,* 830

F.2d 237, 259 (D.C.Cir.1987); *Morgan v. District of Columbia,* 468 A.2d 1306, 1312 (D.C.1983); *Allison Gas Turbine Division of General Motors Corp. v. District of Columbia,* 642 A.2d 841, 844 (D.C.1994). Accordingly, the Court rejects Defendants' argument that they are not liable, as a matter of law, for the constitutional deprivations to Eric Butera.

## III. THE CONSTITUTIONAL CLAIMS OF TERRY BUTERA

■ Defendants next seek judgment as a matter of law with regard to Terry Butera's claims that she was deprived of her constitutional right to the society and companionship of her son.

Unlike the dearth of case law in this jurisdiction on the preceding issue, the D.C. Circuit has spoken definitively on this one. In *Franz v. United States,* 707 F.2d 582 (D.C.Cir.1983), the Court of Appeals ruled that a father's section 1983 claims were valid where his children were separated from him because of their placement in the Federal Witness Protection Program. In so ruling, the court noted "the profound importance of the bond between a parent and a child to the emotional life of both." *Id.* at 599.

The Defendants seek to distinguish *Franz* from these facts stating that there, the due process rights at issue were procedural rather than substantive. The Defendants are incorrect. The Court of Appeals expressly stated that "for constitutional purposes, all [exercised] parental rights [substantive as well as procedural] should be treated as equivalent." *Id.* at 596. Moreover, if the Defendants' position is that the *Franz* case is distinguishable because there the children were merely separated from the non-custodial parent by government action, the logical conclusion to that argument is that a resulting death

---

5. Evidence was presented that Eric Butera had stopped using drugs and had not been to the residence in many months.

6. "[T]he constitutional right involved was not a right to protection per se, but rather a right not to be placed at harm by state officials." *Monfils,* 165 F.3d at 518.

actually reduces the level of constitutional protection. The Court finds the weakness of any such argument to be self-evident.

In fact, it is the similarities with the reasoning in *Franz* that compels this Court to the same result. For example, in *Franz* the Court of Appeals pointed out that it was the government itself that created the danger by inducing the mother of the children to come forward with evidence against organized crime figures. The court stated that "invasion of the plaintiff's rights should not be legitimated by the need to solve a problem the defendants themselves have generated." *Id.* at 604. As discussed at length, a "state created danger" is an important element of the Court's reasoning here. Accordingly, the Defendants' motion for judgment as a matter of law on this issue is denied.

## IV. PUNITIVE DAMAGES

The Defendants next seek to set aside the punitive damage award made against the District of Columbia as well as the individual police officers. The Court will address each separately.

To begin, the Court has already addressed this issue to some extent in its Memorandum and Order of July 7, 1999 (ruling on the Defendants' pre-trial motion for summary judgment). There the Court stated:

> It has been established that under common law and under the pertinent laws of the District of Columbia in particular, a party may seek punitive damages against the District of Columbia where there is a showing of "extraordinary circumstances." *Atchinson v. District of Columbia,* 73 F.3d 418, 425 (D.C.Cir.1996). The precise outline of the "extraordinary circumstances" condition has not been defined. *See Rieser v. District of Columbia,* 563 F.2d 462, 482 (D.C.Cir.1977). However, the Court of Appeals in *Rieser* added peripheral insight to this question: "Punitive dam-

> ages are generally awardable to punish tortfeasors and deter similar conduct, but only where the defendant's conduct was particularly outrageous, demonstrating reckless disregard for the rights of others. Mere inadvertence or even gross negligence is insufficient." *Id.* at 481 n. 100. There, the Court of Appeals concluded that no reasonable jury could have determined "extraordinary circumstances" or "outrageous" and "reckless" disregard on the facts presented. Similarly, in *Smith v. District of Columbia,* 336 A.2d 831 (D.C.App.1975), the D.C. Court of Appeals concluded that under the specific facts of the case, extraordinary circumstances were found to be absent, and therefore, the District of Columbia was determined to be free from punitive damages. The decision, however, did not conclude that the District of Columbia, or any municipality for that matter, was permanently immune from punitive damages under local and common law.

(Mem. and Ord., 7/7/99 at 15.)

The only difference between the Court's holding then and the procedural posture of the case now is that evidence has been submitted to a jury, and the jury has decided that extraordinary circumstances existed to warrant a $26 million award of punitive damages. This effectively ends the Court's analysis in this regard.

■ Concerning the individual Defendant officers, the Court similarly finds no basis to set aside the punitive damage awards against them. The officers argue that even when punitive damages are available, they can not be allowed to consume a defendant's total net worth. (Mtn. at 25 *citing Jonathan Woodner Co. v. Breeden,* 665 A.2d 929, 940 (D.C.1995).) The Court sees no effort by the jury to "destroy" the defendant officers financially. It is true that the jury heard evidence of the officers' gross incomes, but did not hear evidence of their monthly expenses.[7]

---

**7.** This was because the Court ruled such evi-

dence to be beyond the scope of the narrow

This, however, does not by itself prove an excessive award. The punitive damages assessed were $142,000 against each of the officers. This amount was roughly twice their annual salaries. Nowhere do Defendants cite authority that an award twice the individual's annual salary is excessive. As a result, the Court will not set aside or reduce this award.

## V. REMITTITUR OF THE COMPENSATORY DAMAGE AWARDS

■ The Defendants next seek to reduce the $36,530,000 award for Eric Butera's injuries and the $34 million award for Terry Butera's damages. The Defendants first seek a reduction on the basis that the jury allegedly made its award on a "subjective perception of the importance of constitutional rights as an abstract matter" rather than on actual damages. (Mtn. at 26.) The Court sees no evidence of this. In fact, the verdict sheet clearly listed those items for which the jury made its award.[8]

The Defendants also state that the damage awards for the constitutional claims were aggregated with the wrongful death and survival action awards. This is not correct. Again, the Court relies upon the verdict sheet which clearly delineates the injuries and the corresponding compensation. The only comparatively similar categories are the $50,000 award for "Conscious Pain and Suffering" under the Survival action, and the $36 million award for "physical pain and mental anguish" under Eric Butera's Civil Rights claims. (*See* Verdict Sheet.) This is a close call as both involved pain caused to Mr. Butera. The jury, however, apparently drew a distinction between the two categories to the tune of $35,950,000, and the Defendants have not shown why this is improper.[9] Even if the Defendants could show an impropriety, it is clear that the jury intended to award millions of dollars for the pain and anguish Eric Butera suffered during his murder. Any abatement for the Survival Act claim could only amount to $50,000. Notwithstanding, the Court will defer to the jury's discretion in this regard and leave the entire award intact.

■ Defendants' next argue that the awards for the constitutional deprivations should be remitted because they exceed any reasonable range within which a jury could properly operate. *See Jeffries v. Potomac Dev. Corp.*, 822 F.2d 87, 96 (D.C.Cir.1987); *Finkelstein v. District of Columbia*, 593 A.2d 591, 595, 596 n. 8 (D.C.1991). Not only is remittitur within the discretion of the trial Court, but it is the moving party that bears the "heavy burden." *Carter v. Duncan–Huggins, Ltd.*, 727 F.2d 1225, 1239 (D.C.Cir.1984). The Defendants fall short on carrying this burden.

The Defendants argue that the jury must have been moved to "palpable shock and disgust" by the terrible manner in

direct. The Defendants did not seek to put on *their own punitive damage evidence during any other phase of the trial (i.e., Defendants'* case-in-chief.)

8.
    (C) Eric Butera's Civil Rights claims Physical pain and mental anguish    $36,000,000

. . . .

2. What amount do you award Terry Butera on her Civil Rights claim of loss of companionship?    $34,000,000

Please apportion your award among the following:
    (A) past physical pain, mental anguish and inconvenience from the time of Eric Butera's death    $ 9,000,000

    (B) future physical pain, mental anguish and inconvenience    $25,000,000

9. The Plaintiff argues that the two remedies are fundamentally different because the survival action does not provide compensation for the loss of Mr. Butera's right to life, while the section 1983 does so provide. (Opp. at 47.)

which Mr. Butera was murdered and, as a result, decided to send a punitive message as evidenced by their two compensatory civil rights awards of $36 million and $34 million. This theory, however, ignores one salient fact—that the jury actually imposed punitive damages on all of the Defendants, including $27 million against the District of Columbia (for its non-constitutional claims). The Defendants do not explain why the jury simply did not increase the punitive damage awards if it was an additional punitive message they were interested in sending. Instead, they cite the *Finkelstein* case for the notion that a formulaic approach could be considered for the pain and suffering endured by Mr. Butera while he was still conscious.[10] (Mtn. at 29 n. 18.) The Court rejects such an approach.

It is the jury that heard and weighed the evidence in this case. Although probably not reflected in the record, the Court was impressed with both the attentiveness and the deliberate manner in which the jury heard and decided this case. At each stage of the proceeding, the Court had the opportunity to observe these jurors and it appeared to the Court that they digested the overwhelming amount of evidence presented to them (from both sides) and then listened intently to the instructions they were given.[11] Never did they appear emotionally moved by the circumstances of this case, and if they were, the Court has no reason to believe it resulted in an excessive award. The Defendants point to nothing except the size of the awards, arguing for what amounts to a *per se* rule of excessiveness. The Court disagrees with

and rejects a *per se* approach for what the jury was permitted to award for Terry or Eric Butera's pain and mental anguish. With nothing more than the large size of the Judgment, the Defendants have failed to carry their burden of convincing this Court, in its discretion, that the Jury exceeded the reasonable range in which it was permitted to operate. Accordingly, the request for remittitur is denied.

## VI. DEFENDANTS' ALTERNATIVE REQUEST FOR A NEW TRIAL

The Defendants alternatively seek a new trial on a number of different grounds, none of which so warrant.

A motion for a new trial brought pursuant to Fed.R.Civ.P. 61 prohibits the Court from granting a new trial for any "error or defect" or any "admission or exclusion of evidence" either by the Court or the parties, unless the Court's refusal to do so "appears to the Court inconsistent with substantial justice." In fact, the Court must "disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." *Id.*

### The Court's Refusal to Allow Defendants to Call Certain Witnesses

The Defendants restate the arguments of their pretrial motion for substitution of their police practices expert and attack the Court's refusal to allow the substitution of their former expert, Johnny "St. Valentine" Brown. The Defendants, however, state nothing additional that would cause the Court to change its Order of August 17, 1999.[12]

---

**10.** In the *Finkelstein* case (a wrongful death/survival action), an inmate died of an asthma attack after he was assaulted by other inmates. In reducing a judgment of $1,030,-002, the trial court determined that an award of $967,000 to $980,000 for not more than two and one-quarter hours of pain and suffering, could not be sustained. *Finkelstein* 593 A.2d at 596–597.

**11.** In fact, two notes sent by the jury during deliberations actually pointed out two typographical errors: one in the lengthy jury instructions and one in the verdict sheet. Both were rectified.

**12.** The Court denied the motion for two reasons: 1) the false deposition testimony given by the initial expert (and long-time employee of the Defendant District of Columbia), Johnny "St. Valentine" Brown; and, 2) the Court's finding (uncontested) that Defense Counsel wrote the Fed.R.Civ.P. 26(a)(1) expert report for Mr. Brown. (Ord., 8/17/99.)

Next, the Defendants seek a new trial on the basis that the Court forbade the testimony of individuals they had designated to be "fact" witnesses. These individuals, MPD Commander Thomas McGuire, Lt. Roger Jones, and Sgt. J.J. Brennan are all police officer employees of the Defendant District of Columbia. Their proffered testimony was the MPD's use of special employees and undercover civilian operatives in controlled-buy situations as well as "the applicability of policies and procedures and protocols within the [MPD]." (*See* Def. Supp. Pretrial St.) The Plaintiff objected on the basis that such testimony was really an attempt to elicit "back-door expert testimony" on behalf of the Defendants. The Court sustained the objection.

The Court saw no basis then, nor does it now, to admit such testimony. To begin, none of these witnesses had any personal knowledge of the facts in this case, making their designation as fact witnesses suspect at best. *See* Fed.R.Evid. 602 (witness may not testify if no personal knowledge of matter). Moreover, the substance of the testimony being offered (applicability of MPD policies and procedures), is on its face, opinion evidence. Nonexpert opinion evidence is limited to testimony that is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Fed. R.Evid. 701. Neither of these apply to the proffered witnesses.

As for the precluded testimony of Dr. Jonathan Arden, that ruling too was proper. The Defendants proffered that Dr. Arden would "be called to testify regarding the injuries sustained by Mr. Butera and the effects thereof consistent with his testimony in the homicide trial." (Def. Supp. Pretrial St.) The Court sustained the Plaintiff's objection on the basis that Dr. Arden was not Eric Butera's treating

physician, did not observe treatment, and did not perform or even observe the autopsy. He was not offered as an expert, and, based upon his lack of personal knowledge, any proffered factual testimony would be of no relevance. .

The Defendants next seek a new trial because of the Court's refusal to strike allegedly inadmissible testimony by three of Plaintiff's expert witnesses; Dr. Richard Edelman (economist), Dr. Princy Kumar (infectious diseases), and James E. Bradley, Jr. (police practices).[13]

■ Defendants state that Dr. Edelman's testimony was speculative because the lost-future-earnings prediction was not based upon Eric Butera's work history. That argument, however, goes to weight rather than admissibility of the testimony. Dr. Edelman explained in great detail how he came to his predictions, and the Defendants cross-examined him extensively. In any event, it is not improper for a calculation to be based upon earning potential rather than demonstrated earning capacity. *See Hughes v. Pender*, 391 A.2d 259, 263 (D.C.1978).

■ With regard to Dr. Princy Kumar's prediction of Eric Butera's projected life expectancy given his HIV status, that too was properly received. Dr. Kumar was accepted as an infectious disease expert and explained in some detail the methodology she used in coming to her prediction of a 60–year life span. The Defendants attack the testimony on the basis that there is no epidemiological support for such a projection. The prediction was based upon the availability of certain antiviral medications (as well as the continuing introduction of new medications) for treating HIV, known as a "cocktail regimen."

Obviously there is no specific data where individuals have survived for more than 30 years with the HIV infection, mainly because the disease was documented in the

**13.** The Court has discussed at length the issue of Mr. Bradley's testimony earlier in this

memorandum and defers to that analysis.

early 1980's and the treatments have only become available in the last few years. Dr. Kumar's testimony acknowledged this. Her prediction was based not only upon the near miraculous results of the "cocktail," but her own expertise with regard to progression of the virus in an otherwise healthy individual. These are the bases upon which her opinion was based, and the jury was free to disregard them.

### Limitation on Cross-Examination

■ The Defendants next allege that the Court's limitation of their cross-examination of Plaintiff's witnesses was improper. First, they state that they were precluded from inquiring into Eric Butera's conscious pain and suffering with Plaintiff's expert, Dr. Smialek. That is correct. Dr. Smialek testified only to the cause of Mr. Butera's death, as well as how long he lived after he sustained his injuries. He did not offer testimony on conscious pain and suffering and had not been qualified by the Court to offer such testimony. The Court, therefore, sustained the Plaintiff's objection.

Concerning Defendants' allegation that they were improperly limited in their cross-examination of Dr. Kumar because they could not confront her with an article from the *New England Journal of Medicine,* the Court rejects this outright. Dr. Kumar was not the author of that article and it, therefore, had little value for purposes of impeachment. Instead, it appeared to the Court that the Defendants were attempting to submit expert evidence by way of the article, rather than through a live expert witness of their own.[14] The Court properly sustained the Plaintiff's objection.[15]

### Court's Admittance of Financial Document of the District of Columbia

The Defendants state that the Court committed plain error when it admitted Plaintiff's Exhibit 214: "Financial Status Report, Government of the District of Columbia, Preliminary September 1998 Financial Review (Issued November 1998) because the document was inflammatory, unauthenticated and contained outdated information." Under Fed.R.Evid. Rule 901(b)(7), the document, as a data compilation or report held by the District of Columbia Government, is self-authenticating.[16] Moreover, the document was not inflammatory or unfairly prejudicial. Although it suggests a financial surplus for the District of Columbia of $254 million, that by itself is insufficient to show that it was inflammatory. In fact, nowhere in this case did anyone suggest that Eric Butera was killed because the MPD lacked funding or available resources; the only instances in which the Court could envision evidence of a surplus to be inflammatory. Moreover, if the Defendants truly believed the document to contain inaccurate information, they could have sought leave to submit rebuttal evidence. They did not seek to do so.

### The Court's Denial of Defendants' Mistrial Motions

The Defendants argue three instances in which they believe they should have been granted a mistrial. None of them warrants more than a passing analysis.

The first involved an off-the-record conversation between a juror and the Plaintiff's police practices expert, James Bradley, Jr. during a break. The conversation was authorized by the Court's deputy clerk

---

14. Although the Defendants were precluded from substituting their police practices expert, they were never prevented from designating other experts (within the limitations of the discovery schedule).

15. The Court also properly limited the cross-examination of the Defendant officers' concerning their net worth. That analysis is discussed, *supra* at 33.

16. Evidence that a writing authorized by law to be recorded or filed and in fact recorded or filed in a public office, or a purported public record, report, statement, or dated compilation, in any form, is from the public office where items of this nature are kept. Fed.R.Evid. 901(b)(7).

and consisted entirely of an inquiry by the juror of where she could buy "camulite" for her children. After receiving permission from the deputy clerk, Mr. Bradley mentioned two stores that sold the item, at which point the conversation ended. (Bradley Transcript (II) at 47–48.) Given that it was the juror who initiated the conversation, and considering the subject of the conversation, its brevity and that it occurred in the courtroom under the supervision of the deputy clerk, the Court finds no prejudice to the Defendants. *See United States v. Williams,* 822 F.2d 1174 (D.C.Cir.1987).

■ Defendants next state that Plaintiff's counsel improperly told the jury to "send a message" during his closing argument in the liability phase of the case. The Defendants cite *Carter v. District of Columbia,* 795 F.2d 116 (1986), in support. In *Carter,* however, the D.C. Circuit expressly withheld stating whether it would order a new trial solely because counsel asked the jury to "send a message." *Id.* at 138. In fact, even though that case involved only compensatory damages (unlike here), the court noted with approval that compensatory damages for constitutional deprivations are meant to serve a deterrent effect. *Id.* Insofar as the Plaintiff here actually sought punitive damages, the Court finds any prejudice or error to be harmless.

Similarly, Defendants allege that Plaintiff also inflamed the jury by calling upon the jurors to determine how much the decedent would pay to have one more day of life, or the Plaintiff to have her son back for one more day—an alleged "per diem" argument. (*See* 10/20/99 Trial Tr. at 13–14.) The Defendants are incorrect. While it would have been improper for the Plaintiff to state a dollar amount and then ask the jury to multiply that amount, that was not done here. No monetary figures were ever mentioned by counsel during his closing. Moreover, Plaintiff's counsel never asked the jury to stand in the place of the Plaintiff or her son in making their dam-

age award, which would have been a more common example of an attempt to invoke passion or sympathy from the jury. Again, the Court finds no prejudice to the Defendants and certainly no error sufficient to overturn its denial of the mistrial request.

### Court's Refusal to Give Jury Instruction for Assumption of the Risk Defense

■ Lastly, the Defendants seek a new trial on the basis that they were prevented from asserting their affirmative defense that Eric Butera assumed the risk of his conduct. After hearing the evidence in the case, the Court ruled as a matter of law that the assumption of the risk defense was not available to Defendants.

To assert an assumption of the risk defense, the defendant must show that the plaintiff possessed full comprehension and appreciation of the danger and voluntarily accepted the associated risk. *Morrison v. MacNamara,* 407 A.2d 555, 567 (D.C.App. 1979).

The Court already denied Defendants' earlier motion for summary judgment on this same issue. There the Court stated:

Here, Plaintiff disputes whether decedent had the requisite knowledge. She states that her son was never told that on the preceding night, officers had been called to the subject address on drug trafficking complaints. Nor, she states, was decedent told of the MPD's ongoing investigation into organized crime activity in that neighborhood [or that Reynaldo Mathis, the individual later convicted of murdering decedent was, in fact, a target of that investigation]. It appears entirely plausible to the Court that had the decedent been apprised of these factors, he would not have agreed to cooperate with the police officers in their plan.

(Mem. and Ord., 7/7/99 at 13.) All of these factual allegations were borne out by the largely uncontested evidence at trial, including the additional fact that the MPD considered the neighborhood to be so dan-

gerous that they did not even allow their own police officers to go undercover there. As a result, the Court found that the assumption of the risk defense (and instruction) did not apply to the facts of this case because the decedent never possessed the information necessary to give his informed consent. Accordingly, there was no error in the exclusion of that jury instruction.

## PLAINTIFF'S POST–VERDICT PETITION FOR ATTORNEY'S FEES AND COSTS

As a final matter, the Court considers Plaintiff's Post–Verdict Petition for Attorney's Fees and Costs. Defendants contest the reasonableness of Plaintiff's fee petition and seek to reduce the award of fees and costs that Plaintiff has requested. For the reasons that follow, Plaintiff's Petition is granted, in part, and the amount of $695,530.00 in attorney's fees is awarded to the Plaintiff.

### Awarding Attorney's Fees

"A fee applicant bears the burden of establishing entitlement to an award, documenting the appropriate hours, and justifying the reasonableness of the rates." *Covington v. District of Columbia*, 57 F.3d 1101, 1107 (D.C.Cir.1995)(quoting *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)).

The Jury rendered a verdict finding the individual Defendants in violation of Plaintiff's civil rights under 42 U.S.C. 1983. Plaintiff's Petition for Attorney's fees are brought on behalf of herself and the estate of her son, the decedent, pursuant to 42 U.S.C.1988(b), the Civil Rights Attorney's Fees Awards Act of 1976 (Fees Act) which allows "the court in its discretion" to provide "[a] reasonable attorney's fee as part of the cost" to the prevailing party in any action brought under 42 U.S.C.1983. A central purpose for this policy is to encourage an individual with civil rights grievances to seek judicial relief by removing the financial obstacles to obtaining counsel. *Copeland v. Marshall*, 641 F.2d 880, 889 (D.C.Cir.1980). There is

a presumption that the prevailing party "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Hensley v. Eckerhart*, 461 U.S. 424, 429, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). A reasonable award is within the trial judges discretion, "which is central to the operation of the statute." *Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989).

As an initial matter, Defendants' argue that "there was no lawful basis for holding them liable under section 1983" and that the post-trial motions are a special circumstance that would render an award unjust. (*Def. Opp.* at 1.) That argument is mooted, however, by this Memorandum of Law and accompanying Order, which disposes of all of the outstanding post-trial issues.

As a result, the Court determines that Plaintiff has established her entitlement to the fee award by qualifying as a prevailing party under the Fees Act and is entitled to reasonable attorney's fees.

### Lodestar Standard

A reasonable attorney fee standard is assessed using the "lodestar" formula which calculates the hours of work reasonably expended, multiplied by a reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The lodestar calculation is the standard to be utilized in this case as it has been used in other civil rights actions. *See e.g. Hensley, Blanchard, Blum, City of Riverside v. Rivera*, 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986). The Court, however, may adjust the Lodestar figure upward or downward based upon several factors, one of them being the "degree of success obtained." *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4 (D.C.Cir.1984).

Defendants argue that Plaintiff has not met the burden of establishing reasonable attorney's fees because Plaintiff's Lodestar calculation is unreasonable. Defendants have based this contention on three claims: 1) that plaintiff has failed to provide de-

tailed and contemporaneous billing records; 2) that plaintiff failed to demonstrate "billing judgment"; and 3) that the hourly rates are unreasonable and inaccurate.

### The Calculation of the Amount of Hours Charged to Plaintiff

■ To show a reasonable calculation of hours, a fee applicant must provide "contemporaneous time and expense records," *Webb v. Board of Education,* 471 U.S. 234, 238, 105 S.Ct. 1923, 85 L.Ed.2d 233 (1985), which must be "of sufficient detail and probative value." *In Re Donovan,* 877 F.2d 982 (D.C.Cir.1989).

■ Plaintiff has provided the Court with detailed billing records from September 1998 to October 1999. The billing records show contemporaneous accounting for all tasks associated with this case. To show proper billing judgment, the Lodestar figure must also take into account the elimination of time spent on unsuccessful claims, non-productive time and hours that are redundant, excessive or unnecessary. Plaintiff's attorneys have provided complete accounts for the 13 months of work on this case, and eliminated work spent by various other personnel, reducing fees by the sum of $131,990.00. As a result, Plaintiff has provided records that show reasonable billing and has met her burden in documenting appropriate billing hours.

### The Determination of a Reasonable Hourly Fee Rate

The court in *Blum* established an analysis for determining a reasonable hourly rate: "To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum,* 465 U.S. at 896, 104 S.Ct. 1541. "One of the several factors the court used to determine reasonable attorneys' fees . . . was the experience, reputa-

tion, and ability of the attorneys." *Covington,* 57 F.3d at 1108 (quoting *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 718 (5th Cir.1974)).

The D.C. Circuit has approved a uniform standard, the "Laffey Matrix", named for the case in which it was first used. *Laffey v. Northwest Airlines, Inc.,* 746 F.2d 4 (D.C.Cir.1984); *see also Save Our Cumberland Mountains, Inc. v. Hodel,* 857 F.2d 1516 (D.C.Cir.1988). The Laffey Matrix is a schedule of hourly rates based largely on years of federal court experience. *Save Our Cumberland Mountains, Inc.,* 857 F.2d at 1525 (D.C.Cir.1988).

Plaintiff has provided the Court with the Laffey Matrix schedule, as well as her attorneys' affidavits as evidence of the amount of experience and education Plaintiff's attorneys have acquired. (Ex's. "A" and "B," (Decl. Peter C. Grenier), Mot. for Atty. Fees.) Plaintiff's lead counsel, Peter C. Grenier, Esq., has eleven years of litigation experience and practices in both the commercial and personal injury areas. He has represented clients in six separate United States District Courts and two Circuits. Mr. Grenier's hourly rate is charged at $215.00 per hour (Laffey Matrix allows $290.00 per hour). (Ex. "B" at 2, 7.)

Mr. Grenier's co-counsel is Saul Singer, Esq. Mr. Singer has nine years of legal experience and has a "diverse civil litigation" practice and has served as a trial attorney for the United States Department of Justice as a Trial Attorney with the Commercial Litigation Branch. Mr. Singer's hourly rate is charged at $210.00 per hour (Laffey Matrix allows $240.00 per hour). (*Id.* at 3, 7.)

Mr. Grenier's other co-counsel is James Ludwig, Esq. Mr. Ludwig, a partner at the firm, has been admitted to the practice of law since 1988. He practices general and commercial litigation and has represented clients in this court, the D.C. Circuit and the United States District Court for the Southern District of New York. His hourly

rate is charged at $240.00 per hour (Laffey Matrix allows $290.00). (*Id.* at 4,7.)

As shown, Plaintiff has chosen not to use the Laffey Matrix rate and instead, has selected a lower hourly rate. The rate that the Plaintiff has selected is the actual hourly rate charged by Bode & Beckman, Plaintiff's attorneys' firm, for similar work in other cases. (*Id.* at 7.)

Notwithstanding, Defendants argue that Plaintiff's attorneys' hourly rates are nonetheless unreasonable. They contend that the Laffey Matrix rate should not apply because Plaintiff's attorneys' primary litigation experience is in areas other than civil rights litigation. This contention is not relevant, as Plaintiff's attorneys have voluntarily chosen not to apply the Laffey Matrix as their fee rate standard and instead have selected their firm's established billing rate which is significantly lower. Moreover, the Plaintiff's attorneys have provided evidence of litigation experience with federal issues, through their affidavits, which is what the Laffey Matrix charts. Although the Defendants assert that the Plaintiff's selected attorney's fees rate should be reduced even further than Bode & Beckman's standard rates, Defendants cite no authority to support their selected rate and provide no evidence of other firm's billing rates for similar work to support this contention. As a result, the Court finds that the Plaintiff has satisfied the requirements in *Blum*, and provided strong evidence to establish a reasonable attorney's fee rate.

### Awarding Costs

Separate from the attorney's fee issue, the Defendants state several objections to the Plaintiff's Bill of Costs (which seeks $192,920.00): 1) fees of court reporter and transcript costs; 2) printing costs; 3) cost of criminal trial transcripts; 4) expert witness fees; 4) Computer assisted legal research, cab fare, postage and air-conditioning costs. For the most part, Defendants are correct.

The statute that allows for taxation of costs is 28 U.S.C. § 1920 (Taxation of costs). Under Local Rule LCvR 54.1(d) (formerly Local Rule 214(d)), there are fourteen enumerated allowable costs, which actually expand the details of those stated under section 1920. This Court has traditionally taken a narrow view of what is permitted as a recoverable cost, and does so here now.[17]

With regard to the court reporter fees for transcripts, the Plaintiff seeks a total of $26,981.06. The Defendants state that only those transcripts that were used at the trial may be taxed as a cost. The Defendants are incorrect. The Comment to LCvR 54.1 expressly states "that the costs of depositions used in support of motions or pleadings may be taxed as well as depositions used at trials or hearings." The Defendant is correct, however, that videotaped depositions and the court reporters' expedited rate for transcripts are not recoverable (LCvR 54.1(d)(6) allows for recovery of the original and one copy of a transcript at the reporters standard rate). It is unclear from the itemizations submitted by Plaintiff how such expenses may be delineated and the Court, therefore, denies that request, without prejudice, pending resubmission of an amended Bill of Costs that does not include costs for videotaping or expedited transcripts.

The Plaintiff next seeks a total of $22,943.85 for "fees and disbursements for printing." Under LCvR 54.1(d)(8), costs may be recovered for "copying those exhibits that are introduced into evidence, used for impeachment or filed with the Clerk." LCvR 54.1(d)(9) allows for any other copying costs (not reflected in subsection 8), but only up to $300.00. Once again, this request must be denied, without prejudice. The Plaintiff does not segregate the copying costs that might apply

---

17. The Court declines to award any non-conforming costs as sanctions, as the Plaintiff wishes it to do. Compensation for time spent in additional discovery is fairly reflected in the Court's attorney's fee award.

under subsection 8 with what might only be available under subsection 9.

In addition, Plaintiff seeks $4,175.75 for the cost of transcripts in the trial of *United States v. Renaldo Mathis* (the underlying criminal trial); $440.00 for transcripts of the trial herein, and $150.00 for materials from the Office of the D.C. Medical Examiner (Autopsy photographs and report). Under LCvR 54.1(d)(7), the transcript costs of a trial or hearing are recoverable only if it is either necessary for appeal or was required by the Court to be transcribed. Neither of those situations is present here, nor was the criminal transcript utilized in connection with the above referenced subsection 8. This is true as well for the $440.00 request for "transcripts of this matter." Recovery for costs for the criminal trial transcripts as well as "other transcripts," is denied.[18]

Plaintiff next seeks $96,179.84 in expert witness fees. The Defendants object on the basis that non-court appointed expert witness costs are not recoverable under LCvR 54.1(d)(12). Defendants are correct. Expert witness fees beyond the statutory limit of ($40.00) per day are not available to a prevailing party except where the expert is appointed by the Court. *See Crawford Fitting Co. v. Gibbons, Inc.*, 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987); 28 U.S.C. § 1821(b). The Court "appointed" no experts in this case and the Plaintiff, therefore, is not entitled to costs for her experts above the $40.00 per day paid to all witnesses. This request too, is denied, without prejudice.

With regard to the remaining objections, the Court denies the following costs on the basis that they are outside of what is permitted by LCvR 54.1(d): 1) recovery of $27,526.67 for the use of WESTLAW computer assisted legal research; 2) $575.00 for cab fare; 3) $465.10 for postage; 4) $135.07 for long distance calls; 5) 110.91 for trial notebooks and exhibit holders; 6)

27.50 for word processing services; 7) $660.00 for air conditioning Plaintiff's attorney's office on a working weekend.

Accordingly, Plaintiff's requested costs of $192,920.33 are denied without prejudice, until such time as Plaintiff submits an Amended Bill of Costs reflecting the conclusions of this decision. The resubmission is for this limited purpose and the Plaintiff shall not attempt to use this opportunity to re-argue any of the Court's rulings herein.

### CONCLUSION

For the reasons set forth above, the Court denies Defendants' Renewed Motion Pursuant to Fed.R.Civ.P. 50 for Judgment as a Matter of Law, or in the Alternative, Pursuant to Fed.R.Civ.P. 59 Motion for Amendment of the Judgment and for a New Trial, or in the Alternative for Remittitur. With regard to the Plaintiff's Post-Verdict Petition for Attorneys Fees and Costs, the Court finds that Plaintiff has provided appropriate documentation justifying the reasonableness of the fee rates and has met her burden of establishing entitlement to the award of attorney's fees. The Bill of Costs, however, must be reduced and resubmitted. Accordingly the Plaintiff's post-Verdict Petition for Attorney's Fees and Costs is granted and the amount of $695,530.00 in attorney's fees is awarded.

---

18. The $150.00 cost for the photographs and reports from the D.C. Medical Examiner are not opposed by the Defendants and are recoverable.